5JANETTE K. BRIMMER (MN #174762)
ASHLEY N. BENNETT (WSB #53748)
(*Pro Hac Vice Admission pending*)
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA  98104-1711
(206) 343-7340
jbrimmer@earthjustice.org
abennett@earthjustice.org

SARA K. VAN NORMAN (MN #339568)
Van Norman Law, PLLC
400 South 4th Street, Ste. 401
Minneapolis, MN 55415
(612) 299-1794
sara@svn.legal

*Attorneys for Plaintiffs*
*Grand Portage Band of Lake Superior Chippewa, and*
*Fond du Lac Band of Lake Superior Chippewa*

SEAN COPELAND (MN #387142)
Tribal Attorney
Fond du Lac Band of Lake Superior Chippewa
1720 Big Lake Road
Cloquet, MN 55720
(218) 878-2632
seancopeland@fdlrez.com

*Attorney for Plaintiff*
*Fond du Lac Band of Lake Superior Chippewa*

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FIFTH DIVISION

| | |
|---|---|
| GRAND PORTAGE BAND OF LAKE SUPERIOR CHIPPEWA, and FOND DU LAC BAND OF LAKE SUPERIOR CHIPPEWA, | No.  0:22-cv-01783 |
| | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| Plaintiffs, | |

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, and
MICHAEL S. REGAN, Administrator, United States
Environmental Protection Agency,

                    Defendants.

INTRODUCTION

1. Plaintiffs Grand Portage Band of Lake Superior Chippewa ("Grand Portage") and Fond du Lac Band of Lake Superior Chippewa ("Fond du Lac") (collectively the "Bands") bring this action to address the failure of the U.S. Environmental Protection Agency ("EPA") to comply with Clean Water Act requirements for approval of state submissions of water quality standards for Minnesota waters.

2. EPA's approval of Minn. R. 7050.0223 and Minn. R. 7050.0224 (collectively "Minnesota's revised water quality standards") allows Minnesota to eliminate numeric water quality standards for several pollutants primarily discharged by mining, in waters used for industrial (Class 3) and agricultural purposes (Class 4).

3. The elimination of numeric water quality standards for industrial and agricultural uses in Minnesota is likely to result in increased pollution in downstream waters that flow around and through the Bands' reservations, and waters that are important to the Bands' treaty-reserved rights to hunt, fish, and gather throughout their ceded territories.

4. By approving Minn. R. 7050.0223 and Minn. R. 7050.0224, EPA violated the Clean Water Act and abused its discretion under the Administrative Procedure Act by acting arbitrarily, capriciously, and contrary to the record.

5. As set forth in detail below, Grand Portage and Fond du Lac ask that EPA's approval of Minn. R. 7050.0223and Minn. R. 7050.0224 be set aside.

JURISDICTION AND VENUE

6. The Bands bring this action for review under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq*.

7. This court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 5 U.S.C. §§ 701-706 (Administrative Procedure Act).

8. Venue is proper in this Court under 28 U.S.C. § 1391(e) because the Grand Portage Reservation and Fond du Lac Reservation are located in the District of Minnesota. This case is appropriately filed in the Fifth Division of U.S. District Court, District of Minnesota because the Grand Portage Reservation is located in Cook County and the Fond du Lac Reservation is located in Carlton County, which are the counties where venue is proper.

PARTIES AND STANDING

Plaintiffs

9. Grand Portage and Fond du Lac are sovereign, federally recognized Indian tribes with reservations in northern Minnesota. The Grand Portage Reservation is located along Lake Superior in Cook County near the tip of Minnesota's Arrowhead Region. The Fond du Lac Reservation is adjacent to Cloquet, Minnesota, and is bordered on the north and east by the St. Louis River. Numerous surrounding wetlands, lakes, and streams are connected to the waters that flow through and around Grand Portage and Fond du Lac Reservations.

10. The Bands have an existential interest in protecting Minnesota waters and their treaty-reserved rights to hunt, fish, harvest wild rice, and gather food and plants because the

Bands' members rely on natural resources such as wild rice for subsistence, economic, cultural, medicinal, and spiritual purposes.[1]

11. Pollutants like sulfate can adversely affect downstream fish, wild rice, and wetlands relied on by the Bands.  Sulfate can convert into sulfide—a compound that is toxic to wild rice growth. Sulfate can increase mercury contamination of fish adversely affecting the health of people who subsist on it.

12. EPA's approval of Minnesota's water quality standards revision directly threatens and adversely affects the Bands and their members' ability to protect and use waters on their reservations and to fully exercise their treaty-reserved rights.

13. Minnesota's water quality standards revision replaced numeric water quality criteria for ionic pollutants like sulfate that were established for industrial and agricultural uses, resulting in only generally applicable narrative criteria for those pollutants.  Minn. R. 7050.0223 and 7050.0224.

14. In the place of a numeric criteria, the state proposes to include an unworkable "translator" scheme, to be applied on permit-by-permit basis.

15. Removal of numeric criteria for waters designated for industrial and agricultural uses will affect downstream waters with more sensitive use classes, in consequence affecting all waterbodies in Minnesota and putting at risk wild rice, fish, and other aquatic life downstream that the Bands and their members rely on.

16. The Bands submitted extensive comments and testimony objecting to Minnesota's revised water quality standards.

---

[1] 10 Stat. 1109 (Sept. 30, 1854); *see also* Minnesota Department of Natural Resources ("MN DNR"), Laws and Treaties, at https://www.dnr.state.mn.us/aboutdnr/laws_treaties/index.html.

<u>Defendants</u>

17. Defendant United States Environmental Protection Agency ("EPA") is an agency of the United States charged with overseeing and approving or disapproving state water quality standards, pursuant to 33 U.S.C. § 1313, to protect the public health or welfare, enhance the quality of water and serve the purposes of the Clean Water Act.

18. Defendant Michael S. Regan, the chief officer and Administrator of EPA, is the federal official ultimately responsible for EPA's administration and implementation of its legal duties.  Administrator Regan is sued in his official capacity.

LEGAL BACKGROUND

CLEAN WATER ACT REQUIREMENTS FOR WATER QUALITY STANDARDS

1. Congress enacted the Clean Water Act with the explicit objective of restoring and maintaining the chemical, physical, and biological integrity of the Nation's waters.  33 U.S.C. § 1251(a).  To achieve this objective, the Clean Water Act directs states to establish water quality standards that are "sufficient to provide for the protection and propagation of fish, shellfish, and wildlife, as well as recreation in and on the water." *Id.* at § 1331(c)(2)(A).

2. Water quality standards consist of two required components: (1) designated uses of a state's navigable waters; and (2) water quality criteria necessary to protect those designated uses.  33 U.S.C. § 1313(c)(2)(A) and 40 C.F.R. § 131.11(a)(1).  Designated uses are the uses of a waterbody that must be protected, such as public water supplies, propagation of fish and wildlife, consumption of fish, and recreation.  *Id.* at 1313(c)(2)(A) and at § 131.3(f).

3. Water quality criteria define parameters necessary to protect and support the specified designated uses of a waterbody.

4. States are required to adopt water quality criteria that are based on sound scientific rationale. 40 C.F.R. § 131.11(a).  Water quality criteria can either be numeric or narrative. *Id.* at § 131.3(b).

5. Numeric criteria set quantifiable concentrations or levels of pollutants that can be present in waterbody and protect the designated uses of that waterbody.  Narrative criteria describe desired water quality conditions for a waterbody, but contain no quantitative values and lack specificity.

6. EPA regulations instruct States to only adopt narrative criteria if numeric criteria cannot be established or if the state is supplementing numeric criteria. *Id.* at § 131.11(b).

7. Water quality criteria for waters with multiple use designations must support the most sensitive use. *Id.* at § 131.5.

8. New or revised water quality standards in upstream waters cannot adversely affect the attainment and maintenance of water quality standards in downstream waters. *Id.* at § 131.10(b).

9. States must submit any new or revised water quality standards to the EPA for review and disapproval or approval. 33 U.S.C. § 1313(c)(2).

10. A water quality standard becomes applicable only if EPA determines that the standard meets all requirements of the Clean Water Act, including that water quality criteria are adequate to protect designated uses and are based on sound scientific rationale. *Id.* at § 1313(c)(3) and 40 C.F.R. § 131.11(a).

## ADMINISTRATIVE PROCEDURE ACT

11. The Administrative Procedure Act authorizes courts reviewing agency action to hold

unlawful and set aside final agency action, findings and conclusions that are arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A).

12. EPA's approval of state water quality standards is reviewed under this provision of the APA.

## FACTUAL BACKGROUND

## THE GRAND PORTAGE AND FOND DU LAC BANDS' TREATY RESERVED RIGHTS

1. Since time immemorial, the Bands have harvested wild rice and fish from waters that flow throughout their ancestral lands, including territory now known as Minnesota. Wild rice, has cultural, spiritual, economic, and nutritional significance for the Bands— and nearly all of its natural habitat today is in the northern Great Lakes region.

2. Under the 1854 Treaty of LaPointe, the Bands retained usufructuary rights in the lands and waters that flow in northeastern Minnesota and throughout the entire Arrowhead Region.[2]  The Fond du Lac Band also retained usufructuary rights under the 1837 Treaty with the Chippewa, and the 1837 Ceded Territory stretches across east-central Minnesota into Wisconsin ("collectively, the "Ceded Territories").[3]

3. The Bands' usufructuary rights include the right to hunt, fish, and gather for subsistence, economic, cultural, medicinal, and spiritual needs.

---

[2] 10 Stat. 1109 (Sept. 30, 1854); *see also* Minnesota Department of Natural Resources ("MN DNR"), Laws and Treaties, https://www.dnr.state.mn.us/aboutdnr/laws_treaties/index.html.

[3] *See Minnesota, et al. v. Mille Lacs Band of Chippewa Indians, et al.*, 526 U.S. 172 (1999) (confirming off-reservation usufructuary rights under the 1837 Treaty); *see also* Great Lakes Fish and Wildlife Commission ("GLIFWC"), A Guide to Understanding Ojibwe Treaty Rights (2018), https://glifwc.org/publications/pdf/2018TreatyRights.pdf; MN DNR, Main Treaties Page, https://www.dnr.state.mn.us/aboutdnr/laws_treaties/index.html.  The Fond du Lac Band also retains usufructuary rights across northern Wisconsin and Michigan under the 1842 Treaty with the Chippewa.  *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 365 (7th Cir. 1983).

4. To preserve waters that flow through the reservation, wild rice, and other aquatic life that members of the Bands rely on, the Bands sought and were granted "Treatment as an Affected State" ("TAS") status from EPA, allowing them to administer their own Clean Water Act water quality programs.

5. Grand Portage applied for and received TAS status from EPA in 1996 and approved the tribe's initial water quality standards in 2005, which apply to the bordering waterbodies that are negatively affected by activities upstream of the Grand Portage Reservation.[4]

6. Fond du Lac was granted TAS status in 1996 and had its initial water quality standards approved by EPA in 2001, which apply to on reservation waters and wetlands, including the St. Louis River that are negatively affected by activities upstream of the Fond du Lac Reservation.[5]

7. EPA approved the most recent update to Grand Portage's water quality standards in 2018 and to Fond du Lac's water quality standards in 2020.[6]

---

[4] EPA, Water Quality Standards Regulations: Grand Portage Band of Minnesota Chippewa, https://www.epa.gov/wqs-tech/water-quality-standards-regulations-grand-portage-band-minnesota-chippewa; *see also* EPA, Grand Portage Reservation Water Quality Standards, https://www.epa.gov/sites/default/files/2014-12/documents/grandportageband.pdf.

[5] EPA, Water Quality Standards Regulations: Fond du Lac Band of Minnesota Chippewa, https://www.epa.gov/wqs-tech/water-quality-standards-regulations-fond-du-lac-band-minnesota-chippewa; *see also* EPA, Water Quality Standards of the Fond du Lac Reservation, https://www.epa.gov/sites/default/files/2014-12/documents/chippewa-tribe.pdf.

[6] EPA, Water Quality Standards Regulations: Grand Portage Band of Minnesota Chippewa, https://www.epa.gov/wqs-tech/water-quality-standards-regulations-grand-portage-band-minnesota-chippewa; Letter from Tera L. Fong, Division Director, Water Division, EPA Region 5 to Nancy Schuldt, Water Projects Coordinator, Resource Management Division, Fond du Lac band of Lake Superior Chippewa Re: EPA Approval Letter for Fond du lac 2018 triennial Revie (October 5, 2020), http://www.fdlrez.com/rm/downloads/WQSEPAApprovalLetter10-5-2020.pdf.

8. The Bands each have a government-to-government relationship with the state of Minnesota to co-manage treaty resources[7] and with the United States of America to protect tribal, treaty-reserved natural resources.

9. State water quality standards must ensure that the Bands can fully exercise treaty-reserved rights with access to abundant and unpolluted natural resources.

10. Waters in the ceded territories in Minnesota can and have been adversely affected by upstream industrial pollution, particularly mining.

11. Mining releases pollutants such as sulfate that can increase levels of mercury, methylmercury, salinity, conductance, bicarbonates, and hardness—all of which adversely affect wild rice, fish, aquatic life, and wildlife.

12. Industrial pollution can destroy or significantly degrade wetlands, adversely affecting downstream waters by altering or eliminating habitat for aquatic life and wildlife relied on by the Bands for subsistence, economic, and spiritual purposes.

POLLUTANTS THREATENING MINNESOTA'S WATERS

13. Sulfate is a compound that when discharged into waterbodies can be transformed into sulfide that is toxic to aquatic plants like wild rice.  Bacteria in the sediment combines with sulfate causing a bio-chemical reaction, which converts it into sulfide.

14. Sulfide in sediment can destroy wild rice by attaching to the plant's roots and preventing growth.

15. Sulfide can result in the destruction of entire rice beds and can significantly decrease the probability of wild rice growing in those waterbodies.

---

[7] *See*, *e.g.*, Gov. Walz Exec. Order 19-24, "Affirming the Government-to-Government Relationship between the State of Minnesota and Minnesota Tribal Nations: Providing for Consultation, Coordination, and Cooperation" (Apr. 4, 2019).

16. EPA has listed 32 waterbodies used in Minnesota for wild rice as impaired due to sulfate levels.

17. Sulfate can also convert mercury into methylmercury—a form of mercury that can bio-accumulate in the food chain including in fish.  The methylmercury accumulated in fish will, in turn, accumulate in and harm Band members who subsist on, or consumer high levels of, fish.

18. Additionally, sulfate can increase the surface water concentrations of nitrogen, phosphorus, and bicarbonates.  These pollutants can adversely affect water quality, wildlife, plants that provide wildlife habitat, and human health.

19. Chloride can interfere with the ability of lakes to overturn and lead to anoxic conditions in lake and wetland sediments, which allow toxic metals to be released into the water column.  Dissolved oxygen levels are reduced when these toxic metals are released, causing added stress to aquatic life like fish and macroinvertebrates.

20. More than 58% of Minnesota's wetlands have been found in poor condition due to chloride contamination.

21. Other ionic pollutants like sodium, magnesium, and calcium can adversely impact wetlands and aquatic life.

## MINNESOTA'S WATER QUALITY STANDARDS

22. In 1967, Minnesota adopted numeric, pollutant-specific water quality standards to protect the designates uses of the state's waters, including for industrial, agricultural, and wildlife uses.  Minn. Reg. Water Pollution Control ("WPC") 14, Criteria for the Classification of the Intrastate Waters of the State and the Establishment of Standards of Quality and Purity (1967); Minn. Reg. WPC 15, Criteria for the Classification of the

Interstate Waters of the State and the Establishment of Standards of Quality and Purity (1967).

23. When Minnesota revised its numeric water quality standards in 1973, which included express standards for wild rice, EPA approved them that same year. *See*, State Water Quality Standards; Adoptions and Approvals; Minnesota; WPC 14 and WPC 15, 42 Fed Reg. 56789 (Oct. 28, 1977), https://www.govinfo.gov/content/pkg/FR-1977-10-28/pdf/FR-1977-10-28.pdf.

24. Minnesota revised its numeric water quality standards for agriculture and wildlife uses in 1981. MCRA Amendments and Additions, 5 S.R. 2088 (June 29, 1981), https://www.revisor.mn.gov/state_register/5/pdf/.

25. Waters in Minnesota are classified for multiple uses, requiring the most stringent water quality standard be applied so that the most sensitive use is protected. Minn. R. 7050.0415 Subpart 1.[8]

26. Minnesota has seven classes of designated uses of the state's waters including: Class 2 Aquatic Life and Recreation uses, Class 3 Industrial uses, and Class 4 Agriculture and Wildlife uses. Minn. R. 7050.0140. Certain classes of beneficial uses are further divided into subclasses with different water quality standards like Class 4A Agriculture, including wild rice. Minn. R. 7050.0224 Subpart 2.

27. Wild rice is the most sensitive beneficial use of waters within the 4A Class for agricultural uses. Minn. R. 7050.0224 Subpart 2.

---

[8] The classification system that Minnesota used for its rules governing the protection of the state's waters changed from WPC to the Minnesota Code of Administrative Rules system in 1982 and changed again in 1983 to the current rules system codified in Minn. R. ch. 7050.

28. Since 1973, waters used in Minnesota for producing wild rice have been subject to a specific numeric criteria for sulfate of 10 mg/L. *Id.*  There is not a numeric 10 mg/L criteria for sulfate for waters designated for aquatic life.

29. Until the revision that is the subject of this case, Minn. R. 7050.0224 Subpart. 2 also contained numeric criteria for several pollutants that applied to all waters used for agriculture (4A), including the production and protection of wild rice.  These pollutants included bicarbonates, pH, specific conductance, total dissolved salts, and sodium—all pollutants that negatively affect wild rice, the most sensitive and existing use in Class 4A waters.

MINNESOTA'S 2021 WATER QUALITY STANDARDS REVISION

30. In 2021, Minnesota revised its water quality standards for Class 3 Industrial and Class 4 Agriculture and Wildlife uses, replacing the enforceable numeric criteria for ionic pollutants with subjective and generally applicable narrative criteria.  Minn. R. 7050.0223 and Minn. R. 7050.0224.

31. As part of the 2021 revision, Minnesota also changed the way it applies the new water quality standards, assessing compliance only at the point an industrial user *withdraws* water from a waterbody for use and not at the point of discharge.  *See*, *e.g.*, Minn. R. 7053.0205 Subpart 7(D), (E); 7053.0260 Subpart 3 (D); 7053.0263 Subpart 3(B).

32. Minnesota did not examine the potential downstream impacts to wild rice and aquatic life that could occur from eliminating numeric criteria for industrial and agricultural uses.  Instead, the state explained that it was reasonable, and in compliance with the Clean Water Act to focus solely on the industrial and agricultural standards that were being revised.

33. Minnesota acknowledged that there were strong indications that aquatic life are sensitive to the kinds of pollutants at issue in its revision of the water quality standards, but then stated that revision of the industrial and agricultural standards should not be tied to aquatic life standards.

34. Minnesota eliminated numeric criteria for bicarbonates, pH, specific conductance, total dissolved salts, and sodium, which applied to all waters used for agriculture (4A), including waters used to produce wild rice.

35. Minnesota Pollution Control Agency's ("MPCA") studies show that wild rice is very sensitive to high concentrations of those pollutants, such as specific conductance.

36. The state did not assess the impact to wild rice that could occur from removing those numeric criteria that apply to and protect wild rice.

37. The record for Minnesota's revised water quality standards contained information about the difficulty of implementing narrative standards, noting, for instance, that narrative criteria are inherently imprecise, fail to prevent impairment of waterways, and enforcement is unduly burdensome.

38. The record also contained information about MPCA's history implementing the water quality standards that were already in place, detailing, among other things, the state's failure to enforce water quality standards—including the wild rice sulfate standard, allowance of outdated permits without prior limits to stay in effect, and issuance of National Pollutant Discharge Elimination System permits without effluent limits to ensure compliance with water quality standards.

39. Minnesota also did not examine whether water quality standards can be attained and maintained when compliance is assessed only at the point where water is withdrawn for industrial uses.

40. The Bands, along with other tribes in the state, and members of the public submitted extensive comments and testimony objecting to Minnesota's revised water quality standards, because, among other issues, MPCA failed to review the impact of the changes on wild rice and aquatic life and that the change MPCA proposed would adversely affect wild rice and aquatic life.

41. As required by the Clean Water Act, Minnesota submitted its revised water quality standards to EPA for review and approval. EPA approved Minnesota's water quality standards revision on October 8, 2021.

42. EPA approved Minnesota's water quality standards revision without examining whether the new, generally applicable narrative criteria affect or protect the downstream designated uses of Minnesota's waters for wild rice and aquatic life.

43. EPA did not analyze the impact to wild rice that could occur from Minnesota eliminating numeric criteria for waters used for agriculture, which apply to and protect waters used for wild rice—the most sensitive use within the classification. Specifically, Minnesota's revised water quality standards removed numeric criteria for bicarbonates, pH, specific conductance, total dissolved salts, and sodium.

44. EPA did not examine whether Minnesota's replacement of numeric criteria with narrative criteria aligns with EPA's regulations on water quality standards and failed, specifically, to analyze whether numeric criteria could not be implemented, contrary to EPA's own regulations favoring numeric criteria.

45. EPA did not consider information in the record about the difficulty of implementing narrative criteria or Minnesota's narrative criteria permitting and enforcement history.

46. EPA did not analyze whether Minnesota can assure compliance with the state's water quality standards downstream for wild rice and aquatic life by assessing pollutants at the point where water is withdrawn for industrial use rather than at the point where pollutants are discharged.

## FIRST CAUSE OF ACTION

### EPA Approval of Minnesota's Water Quality Standards Revision is Contrary to the Clean Water Act and Clean Water Act Implementing Regulations.

47. The Bands re-allege each and every allegation set forth in this complaint.

48. The Clean Water Act requires states to establish water quality standards that are "sufficient to provide for the protection and propagation of fish, shellfish, and wildlife, as well as recreation in and on the water." 33 U.S.C. § 1331.

49. Water quality standards must include designated uses of a waterbody and water quality criteria necessary to protect those uses. *Id.* at § 1313(c)(2) and 40 C.F.R. § 131.6.

50. Water quality criteria set pollutant limits that assure the protection of designated uses in the Nation's waters. 40 C.F.R § 131.3(b). "When criteria are met, water quality will generally protect the designated use." *Id.*

51. Under EPA regulations, states must adopt water quality criteria that protect the designated uses in its waterbodies. 40 C.F.R. § 131.11(a).

52. EPA regulations direct states to adopt narrative criteria only when numeric criteria cannot be established or when the state is supplementing numeric criteria. 40 C.F.R. § 131.11(b).

53. Under EPA regulations, states must ensure that water quality criteria set for designated uses in upstream waters do not adversely impact designated uses in downstream waters. 40 CFR 131.10(b).

54. Water quality criteria for waters with multiple use designations must support the most sensitive use. *Id.* at § 131.5.

55. States must submit any new or revised water quality standards to the EPA for review and disapproval or approval. 33 U.S.C. § 1313(c)(2)

56. EPA can only approve a state's water quality standards if they are consistent with Clean Water Act requirements and EPA's own regulations. 33 U.S.C. § 1313 (c)(3); 40 CFR § 131.5(a) & (b).

57. Minnesota revised its water quality standards replacing long-standing, enforceable numeric criteria for upstream industrial and agricultural uses with subjective narrative criteria, which do not protect downstream designated uses for wild rice and aquatic life and do not meet the requirements of the Clean Water Act and EPA's own regulations.

58. Contrary to Clean Water Act requirements and EPA's own regulations, EPA approved Minnesota's water quality revision without examining and ensuring that eliminating numeric criteria in upstream waters for industrial and agricultural uses would not interfere with meeting water quality standards for other downstream uses like wild rice and aquatic life. 33 U.S.C. § 1313 (c)(3); 40 CFR § 131.5(a) & (b); 131.10(b).

59. EPA's approval directly conflicts with the agency's own regulation that directs states to adopt narrative criteria only when numeric criteria cannot be established or when the state is supplementing numeric criteria. 40 C.F.R. § 131.11(b).

60. Minnesota could establish numeric criteria for ionic pollution in waters with industrial and agricultural uses since they were already in place before the state eliminated them through its 2021 revision of the water quality standards.

61. EPA also did not examine and ensure that the most sensitive uses in Minnesota waters would be protected if numeric criteria for industrial and agricultural uses were eliminated.  *Id.* at § 131.5

62. Based on the foregoing, and 5 U.S.C. § 706(2)(A), the Bands are entitled to an order vacating EPA's approval of Minnesota's water quality revision.

SECOND CAUSE OF ACTION

EPA Approval of Minnesota's Water Quality Standards Revision is Contrary to the Evidence and Arbitrary and Capricious.

63. Plaintiffs re-allege each and every allegation set forth in this complaint.

64. Minnesota revised its water quality standards, eliminating its long-standing, enforceable numeric criteria for upstream industrial and agricultural uses and replacing them with subjective narrative criteria that do not protect downstream designated uses for wild rice and aquatic life and do not meet the requirements of the Clean Water Act.

65. The record includes information demonstrating that removal of numeric water criteria would adversely impact downstream designated uses in Minnesota waterways, outlining the difficulty of implementing narrative criteria, and detailing Minnesota's weak enforcement record.

66. MPCA's own studies show that wild rice is very sensitive to high concentrations of those pollutants, such as specific conductance, and yet the agency did not analyze the impact that removing numeric criteria would have on wild rice.

67. Contrary to the evidence in the record, EPA approved Minnesota's water quality revision.

68. Under EPA regulations, water quality criteria must be based on sound scientific rationale.  40 C.F.R §§ 131.5(a)(2); 131.11(a).

69. EPA's own regulations require the agency to consider and ensure the attainment and maintenance of downstream water quality standards when revisions to water quality criteria in upstream waters are made.  40 CFR 131.10(b).

70. EPA approved Minnesota's revised water quality standards for industrial and agricultural uses without providing an explanation or record-based rationale or scientific rationale to suggest that Minnesota's numeric criteria are infeasible or that downstream uses would still be protected when the numeric criteria for upstream waters are removed.

71. EPA did not consider the impact eliminating numeric criteria for industrial and agricultural uses in upstream waters would have on the attainment and maintenance of downstream water quality standards for other uses like wild rice and fish.

72. EPA approved Minnesota's revised water quality standards without providing an explanation or record-based rationale or scientific rationale to justify eliminating numeric criteria that applied to waters used for agriculture, including wild rice for the following pollutants: bicarbonates, pH, specific conductance, total dissolved salts, and sodium.

73. EPA did not consider the impact to wild rice that could occur from removing numeric criteria that applied to waters used for agriculture, including wild rice for the following pollutants: bicarbonates, pH, specific conductance, total dissolved salts, and sodium.

74. EPA failed to examine whether Minnesota could properly assure compliance with the state's water quality standards downstream for wild rice and aquatic life by measuring pollutants at the point where water is withdrawn for industrial uses rather than where pollutants are discharged.

75. EPA's approval of the Minnesota's revised water quality standards is contrary to the entirety of the record and is arbitrary, capricious, and an abuse of discretion.

76. Based on the foregoing, and 5 U.S.C. § 706(2)(A), Plaintiffs are entitled to an order vacating EPA's approval of Minnesota's water quality revision.

### REQUEST FOR RELIEF

Based on the foregoing, requests the following relief:

A. A declaration that EPA acted in violation of the Clean Water Act and applicable regulations in approving Minnesota's repeal of numeric water quality standards for Class 3 industrial uses and Class 4 agricultural uses, Minn. R. 7050.0223 and Minn. R. 7050.0224.

B. A declaration that EPA's approval of Minnesota's water quality standards revision, Minn. R. 7050.0223, 7050.0224, 7053.0205 Subpart 7(D), (E), 7053.0260 Subpart 3(D), 7053.0263 Subpart 3(B), is arbitrary and capricious and an abuse of discretion;

C. Vacatur of EPA's approval of Minnesota's water quality standards revision, Minn. R. 7050.0223, 7050.0224, 7053.0205 Subpart 7(D), (E), 7053.0260 Subpart 3(D), 7053.0263 Subpart 3(B);

D. An award of the Bands' costs and attorneys' fees as determined appropriate under the Equal Access to Justice Act; and

E. Such other and further relief as the Court deems just and equitable.

Respectfully submitted this 14th day of July, 2022.

_____
JANETTE K. BRIMMER (MN #174762)
ASHLEY N. BENNETT (WSB #53748)
(*Pro Hac Vice Admission pending*)
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA  98104-1711
(206) 504-3459
jbrimmer@earthjustice.org
abennett@earthjustice.org

SARA K. VAN NORMAN (MN #339568)
Van Norman Law, PLLC
400 South 4th Street, Ste. 401
Minneapolis, MN 55415
(612) 299-1794
sara@svn.legal

*Attorneys for Plaintiffs*
*Grand Portage Band of Lake Superior Chippewa,*
*and*
*Fond du Lac Band of Lake Superior Chippewa*

SEAN COPELAND (MN #387142)
Tribal Attorney
Fond du Lac Band of Lake Superior Chippewa
1720 Big Lake Road
Cloquet, MN 55720
(218) 878-2632
seancopeland@fdlrez.com

*Attorney for Plaintiff Fond du Lac Band of Lake*
*Superior Chippewa*