UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| GRAND PORTAGE BAND OF LAKE SUPERIOR CHIPPEWA, and FOND DU LAC BAND OF LAKE SUPERIOR CHIPPEWA, | Civil No. 22-cv-01783-JRT-LIB |
| Plaintiffs, | |
| v. | PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency, | |
| Defendants, | |
| and | |
| COALITION OF GREATER MINNESOTA CITIES, RANGE ASSOCIATION OF MUNICIPALITIES AND SCHOOLS, MINNESOTA CHAMBER OF COMMERCE, CLEVELAND-CLIFFS, INC., and UNITED STATES STEEL CORPORATION, | |
| Intervenor-Defendants. | |

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

BACKGROUND ....................................................................................................... 2

    I.    THE GRAND PORTAGE AND FOND DU LAC BANDS' TREATY-RESERVED RIGHTS IN MINNESOTA WATERS ........................................ 2

    II.   POLLUTANTS HAVE IMPAIRED AND ARE THREATENING USES OF MINNESOTA'S WATERS. ...................................................................... 5

    III.  EPA MUST ENSURE WATER QUALITY STANDARDS PROTECT DESIGNATED USES OF THE STATE'S WATERS. ..................................... 9

    IV.  MINNESOTA'S WEAKENING OF LONGSTANDING NUMERIC WATER QUALITY CRITERIA. ........................................................... 11

    V.   THE POTENTIAL ADVERSE IMPACTS FROM MINNESOTA'S WEAKENING OF WATER QUALITY STANDARDS. ................................ 13

    VI.  DESPITE CONCERNS ABOUT ADVERSE IMPACTS, EPA APPROVED MINNESOTA'S WEAKENING OF LONGSTANDING NUMERIC WATER QUALITY CRITERIA ...................................................... 17

STANDING ............................................................................................................ 18

STANDARD OF REVIEW ..................................................................................... 19

ARGUMENT .......................................................................................................... 21

    I.    EPA'S APPROVAL OF MINNESOTA'S REVISED WATER QUALITY STANDARDS IS CONTRARY TO THE CLEAN WATER ACT AND IMPLEMENTING REGULATIONS ................................................. 21

         A.   The Clean Water Act Mandates That Water Quality Standards Include Criteria That Protect the Designated Uses of Minnesota's Waters. ........ 22

         B.   EPA Ignored Clean Water Act Regulations That Numeric Criteria Should Be Adopted Whenever Possible When It Approved Minnesota's Revised Water Quality Standards ......................................... 23

         C.   EPA Approved Minnesota's Revised Water Quality Standards Without Properly Analyzing Impacts to Other Instream and Downstream Water Quality Standards. .............................................................. 26

            1.  The record is replete with evidence of the potential for adverse impacts to aquatic life from pollutants. ................................ 28

i

a.    The adverse impact to aquatic life from the increased specific conductivity the revised standards allow. .................................... 29

b.    The adverse impact to aquatic life from increases in sulfate that the revised standards allow. ................................................... 30

c.    The adverse impact to aquatic life from increases in chlorides that the revised standards allow. ................................................. 31

2.    Minnesota and EPA had evidence of the potential adverse impacts to wild rice from the pollutants being deregulated. ........................... 33

D.    Neither Minnesota nor EPA Evaluated the Impact that the Revised Water Quality Standards Would Have on Tribal Reserved Rights as Required by The Clean Water Act. ......................................... 36

E.    Narrative Translators Do Not Cure the Deficiencies in Minnesota's Revised Standards. ........................................................................ 38

II.    EPA DISREGARDED EVIDENCE CONCERNING MINNESOTA'S MANAGEMENT OF ITS WATER QUALITY ................................................ 39

CONCLUSION ................................................................................................. 41

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Am. Wild Horse Pres. Campaign v. Perdue*,
   873 F.3d 914 (D.C. Cir. 2017) ...................................................................... 39

*Anacostia Riverkeeper, Inc. v. Jackson*,
   798 F. Supp. 2d 210 (D.D.C. 2011) ............................................................. 26

*Burlington Truck Lines v. United States*,
   371 U.S. 156 (1962) ..................................................................................... 20

*Cent. Platte Nat. Res. Dist. v. U.S. Dep't of Agric.*,
   643 F.3d 1142 (8th Cir. 2011) ..................................................................... 19

*Citizen, Inc. v. FAA*,
   988 F.2d 186 (D.C. Cir. 1993) ..................................................................... 20

*El Dorado Chem. Co. v. U.S. E.P.A.*,
   763 F.3d 950 (8th Cir. 2014), 2013 WL 3989862 (C.A.8) .................................. 26, 39

*Humane Soc'y of United States v. Zinke*,
   865 F.3d 585 (D.C. Cir. 2017) ..................................................................... 39

*Miccosukee Tribe of Indians of Fla. v. United States*,
   No. 04-21448-CIV, 2008 WL 2967654 ...................................................... 37

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
   526 U.S. 172 (1999) ....................................................................................... 3

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ....................................................................................... 20

*Nat. Res. Def. Council, Inc. v. US EPA*,
   16 F.3d 1395 (4th Cir. 1993) ....................................................................... 23

*Nw. Envtl. Advocates v. US EPA*,
   855 F. Supp. 2d 1199 (D. Or. 2012) ...................................................... 23, 24

*Ohio Valley Envt. Coal. v. Elk Run Coal co.*,
   24 F. Supp. 3d 532, 561 (S.D.W. Va. 2014) ............................................... 30

*Sierra Club v. EPA*,
  252 F.3d 943 (8th Cir. 2001) ................................................................ 20

*Transmission Agency of N. Cal. v. FERC*,
  628 F.3d 538 (D.C. Cir. 2010) .............................................................. 20

*United States v. Bresette*,
  761 F. Supp. 658 (D. Minn. 1991) .......................................................... 3

*W. Va. Rivers Coal. v. E.P.A.*,
  No. CIV A 03-1022 2014 WL 354327 (E.D. Pa. Jan 14, 2004) ................ 26

**State Cases**

*In re. Reissuance of NPDES/SDS Permit to U.S. Steel Corp. for Minntac
  Facility*,
  937 N.W.2d 770 (Minn. App. 2019), *partially rev'd on other grounds*,
  952 N.W.2d 572 (Minn. 2021) .......................................................... 17, 40

**Federal Statutes**

5 U.S.C. § 706(2)(A) ................................................................................ 20

33 U.S.C. § 1251(a)(2) ............................................................................ 28

33 U.S.C. § 1251(a) ................................................................................... 9

33 U.S.C. § 1313(c) ................................................................................. 22

33 U.S.C. § 1313(c)(2) ..................................................................... 9, 10, 22

33 U.S.C. § 1313(c)(2)(A) ..................................................................... 1, 9

33 U.S.C. § 1313(c)(3) ............................................................ 11, 21, 26, 32

33 U.S.C. § 1313(c)(4) ............................................................................ 11

33 U.S.C. § 1371(a)(3) ....................................................................... 11, 22

1837 Treaty, 7 Stat. 537 (July 20, 1837) .................................................. 3

1854 Treaty of LaPointe, 10 Stat. 1109 (Sept. 30, 1854) ......................... 3

**State Statutes**

Minn. Stat. § 10.65 .................................................................................... 4

Minn. Stat. § 97A.157 ................................................................................ 3

Minn. Stat. § 626.94 ................................................................................ 4

**Rules**

Fed. R.Civ.P. 56.................................................................................... 19

**Regulations**

40 C.F.R. § 131.2.................................................................................. 22

40 C.F.R. § 131.3(b) ............................................................................. 10

40 C.F.R. § 131.3(f) ............................................................................... 9

40 C.F.R. § 131.5.................................................................................. 10

40 C.F.R. § 131.5(a)(2)............................................................. 10, 22, 26

40 C.F.R. § 131.6(b) ....................................................................... 10, 21

40 C.F.R. § 131.10(b) ..................................................................... *passim*

40 C.F.R. § 131.11(a) ...................................................................... 10, 22

40 C.F.R. § 131.11(a)(1) ......................................................................... 9

40 C.F.R. § 131.11(b)............................................................ 10, 22, 24, 25

40 C.F.R. § 131.11(b)(2) ....................................................................... 24

40 C.F.R. § 131.11(e) ............................................................................ 10

42 Fed. Reg. 56789 (Oct. 28, 1977) ...................................................... 12

81 Fed. Reg. 85417 (November 28, 2016) .............................................. 37

87 Fed. Reg. 74361, *et seq*. (Dec. 5, 2022) .................................... *passim*

Fond du Lac Water Quality Standards Ord. #12/98 ................................... 4

Minn. R. 7050.022 ............................................................................... 32

Minn. R. 7050.0140 .............................................................................. 11

Minn. R. 7050.0223 ..................................................................... 1, 2, 12

Minn. R. 7050.0224 ................................................................................*passim*

Minn. R. 7050.0224 Subpart 2 ......................................................... 11

Minn. R. 7053.0205 Subpart 7(D) .............................................. 13, 35

Minn. R. 7053.0205 Subpart 7(E) .............................................. 13, 35

Minn. R. 7053.0260 Subpart 3 (D) ............................................. 13, 35

Minn. R. 7053.0263 Subpart 3(B) .............................................. 13, 35

**Other Authorities**

1854 Treaty Authority, 1854 Ceded Territory Resource Map,
  https://tinyurl.com/3z8u45uc. ........................................................ 34

EPA, Adm'r Mem.,
  https://tinyurl.com/bdfd4ew4 ........................................................ 11

EPA, National Aquatic Resource Surveys, Indicators, Conductivity,
  https://tinyurl.com/2p8urtk5 ...................................................... 6, 29

EPA, Tribal Water Quality Standards, Fond du Lac Band,
  https://www.epa.gov/wqs-tech/water-quality-standards-regulations-
  fond-du-lac-band-minnesota-chippewa ......................................... 4

EPA, Tribal Water Quality Standards, Grand Portage Band,
  https://www.epa.gov/wqs-tech/water-quality-standards-regulations-
  grand-portage-band-minnesota-chippewa ...................................... 4

FDL Health Impact Assessment: *Expanding the Narrative of Tribal Health:
  The Effects of Wild Rice Water Quality Rule Changes on Tribal Health*
  (2018),
  http://www.fdlrez.com/RM/downloads/WQSHIA.pdf ................................. 2

McCann, Mercury Levels in Blood from Newborns in the Lake Superior
  Basin Final Report Nov. 30, 2011,
  https://www.health.state.mn.us/communities/environment/fish/ ................... 8

MPCA, Minnesota's Impaired Waters List,
  https://tinyurl.com/2p9e9k4y ...................................................... 31

MPCA, St. Louis River Watershed Identification Report, [St. Louis River
  Stressor Rep.] p. 41, Table 9 (Dec. 2016),
  https://tinyurl.com/4j4d5stm ............................................... 7, 15, 30

Press Release, EPA Region 5, EPA Transmits Addition of 32 Waters to
Minnesota's 2020 Impaired Waters List ("EPA Impaired Waters Press
Release") (Nov. 9, 2021),
https://tinyurl.com/2fwvp6b5 .................................................................................*passim*

Pres. Memo. on Tribal Consultation and Strengthening Nation-to-Nation
Relationships (Jan. 26, 2021),
https://tinyurl.com/3sfy6wj5 ................................................................................. 3

Press Release, MPCA, 10 Smart Salting Tips that Protect Minnesota Water
(Dec. 12, 2016),
https://tinyurl.com/uk7ehc8u ..................................................................................... 33

US Geological Survey, Lake Levels and Water Quality in Comparison to
Fish Mercury Body Burdens, Voyagers National Park, Minn. 2013-
2015,
https://tinyurl.com/mvez9fxy ..................................................................................... 31

INTRODUCTION

Environmental Protection Agency ("EPA") has an obligation to protect and restore our Nation's waters for all users of those waters, including tribes.  Water is a source of sustenance and economic vitality for the Fond du Lac and Grand Portage Bands of Lake Superior Chippewa (the "Bands").  Water is integral to each Band's history, culture, and spiritual identity.  These are the values and uses that EPA is legally obligated to protect under the Clean Water Act, an obligation that EPA failed to meet when it approved the Minn. R. 7050.0223 and Minn. R. 7050.0224 (collectively "Revised Water Quality Standards").

The Clean Water Act requires the development of water quality standards that protect the nation's waters for human health, aquatic life, and wildlife.   33 U.S.C. § 1313(c)(2)(A).  In developing water quality standards, states and EPA must assess and ensure that all instream and downstream uses of water are protected.  Both Minnesota and EPA failed to assess the impact of relaxing water quality standards for several pollutants that can be detrimental to downstream aquatic life and aquatic plants, and most importantly, the Bands' treaty-reserved rights to fish and harvest wild rice in waters that flow throughout their reservations and the lands they ceded through treaties.  EPA's approval of Minnesota's Revised Water Quality Standards runs counter to the Clean Water Act, Clean Water Act Regulations, and the record in this case.

The Bands respectfully request that the Court reverse and vacate EPA's approval of Minnesota's Revised Water Quality Standards, Minn. R. 7050.0223 and Minn. R. 7050.0224.

## BACKGROUND

I.    THE GRAND PORTAGE AND FOND DU LAC BANDS' TREATY-RESERVED RIGHTS IN MINNESOTA WATERS

> *We are one with the rice. You take my rice, you take my left arm. You take my fish, you take my right arm. There is no distinction, it's who we are. It is our connection to the mother earth.*[1]

For hundreds of years, the Bands have harvested wild rice and fish from waters that flow throughout their ancestral lands, including the territory now known as Minnesota. Wild rice, *manoomin* in the Ojibwe language, has central cultural, economic, subsistence, ecological, medicinal, and spiritual importance to the Bands and to other indigenous peoples throughout the region. Wild rice is part of the "Seven Fires" prophecy brought to the Ojibwe over a millennium ago when they resided along the Atlantic Coast. *See* FDL HIA at 8. That prophecy warned of the arrival of colonizers who would threaten Ojibwe lands and culture and directed the Ojibwe to seek out a promised land where the "food grows on water." *Id.* This prophecy led to the migration of the Ojibwe to the Great Lakes region, where they ultimately found abundant wild rice. *Id.* Manoomin grows nowhere else in the world except in the northern Great Lakes

---

[1] FDL Health Impact Assessment: *Expanding the Narrative of Tribal Health: The Effects of Wild Rice Water Quality Rule Changes on Tribal Health* (2018) at 15 ("FDL HIA"), http://www.fdlrez.com/RM/downloads/WQSHIA.pdf.

region.  *See generally,* Standing Decls. of Fond du Lac Natural Resources Program

Manager Thomas Howe and Grand Portage Secretary/Treasurer April McCormick.

Bandmembers' rights to harvest wild rice and other resources are protected under

their treaties and federal law.  Under the 1854 Treaty of LaPointe, the Bands retain

usufructuary rights that include hunting, fishing, and gathering rights in the lands and

waters in northeastern Minnesota and throughout the entire Arrowhead Region.  *See* 10

Stat.  1109 (Sept. 30, 1854); *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526

U.S. 172, 184 (1999) (noting "the 1854 Treaty established new hunting and fishing rights

in the territory ceded by the Treaty"); Minn. Stat.  § 97A.157 (settling suits to enforce

1854 Treaty); *see also United States v. Bresette*, 761 F. Supp. 658, 661 (D. Minn. 1991)

(confirming the "Seventh Circuit has interpreted the 1837, 1842, and the 1854 treaties as

reserving full usufructuary rights for the Chippewa on the ceded territories.") (Internal

citations omitted)).  The Fond du Lac Band also retains usufructuary rights under the

1837 Treaty with the Chippewa, which stretches across east-central Minnesota into

Wisconsin.  *See* 1837 Treaty, 7 Stat.  537 (July 20, 1837); *see also Mille Lacs Band of

Chippewa Indians*, 526 U.S. at 188 (affirming usufructuary rights in 1837 Treaty).

Collectively, these off-reservation lands and waters are the "Ceded Territories."

The Bands each have a government-to-government relationship with the U.S.

federal government, which has a trust responsibility to protect treaty-reserved natural

resources.  *See*, *e.g.*, Pres. Memo. on Tribal Consultation and Strengthening Nation-to-

Nation Relationships (Jan. 26, 2021), https://tinyurl.com/3sfy6wj5 (last visited Apr. 11,

2023).  The Bands have a statute-based government-to-government relationship with the

state and co-manage treaty resources in the Ceded Territories. *See, e.g.*, Minn. Stat. Secs. 10.65; 626.94.

Both Bands have robust water resources programs with Treatment as a State Status for key Clean Water Act functions, making them downstream regulators from the State of Minnesota. To preserve waters that flow through the reservation, wild rice, fish, and other aquatic life that Bandmembers rely on, the Bands have adopted their own water quality standards to address water toxicity from total dissolved salts indicated by conductivity and pollutants including sulfate and mercury. EPA approved the most recent update to Grand Portage's water quality standards in 2018[2] and to Fond du Lac's water quality standards in 2020.[3]

Each Band's standards include a 10 mg/L sulfate limit for wild rice waters, among other protections for wild rice habitat, to prevent the destruction of wild rice from that the pollutant. Fond du Lac Water Quality Standards Ord. #12/98, as amended ("FDL Water Quality Standard") at Sec. 301(p) (wild rice sulfate standard); Grand Portage Water Quality Standards ("GP Water Quality Standrad") at Sec. XI (10) (same); *see also* FDL Water Quality Standard at Sec. 301(n) (narrative and antidegradation standard); GP Water Quality Standard at Sec. XI(6) (narrative standard).

Fond du Lac also has a maximum numeric specific conductance standard of 300 uS/cm, FDL WQS Sec. 301(k), and both Bands have numerous protections for aquatic

---

[2] EPA, Tribal Water Quality Standards, Grand Portage Band, https://www.epa.gov/wqs-tech/water-quality-standards-regulations-grand-portage-band-minnesota-chippewa.
[3] EPA, Tribal Water Quality Standards, Fond du Lac Band, https://www.epa.gov/wqs-tech/water-quality-standards-regulations-fond-du-lac-band-minnesota-chippewa.

life (which includes not only fish, but other freshwater organisms). FDL Water Quality Standard Secs. 301(a), (e), (f), 302(C), 803, App'x 1; GP Water Quality Standard at Secs. V(B); XI (1), (5). Each Band's water quality standards also set limits for mercury at levels intended to protect tribal members' traditional rates of fish consumption, a rate that tends to be higher than that of the general non-native population. FDL Water Quality Standard Sec. 301(e)(1) (fish consumption assumed to be .060 kg/day), App'x 1 (mercury numeric limits); GP Water Quality Standard Sec. XIII (10) (142.5 g/day assumed fish consumption), Table 6 (mercury limits).

II.    POLLUTANTS HAVE IMPAIRED AND ARE THREATENING USES OF MINNESOTA'S WATERS.

Industrial discharges of salty[4] or ionic pollutants (most of the pollutants at issue in this case) in waters that flow around and throughout the Ceded Territories in Minnesota can and do have a detrimental impact on aquatic life and aquatic plants like wild rice. There is scientific consensus that freshwater salination[5] or saltiness leads to the biological degradation of aquatic ecosystems. AR 6025.[6] *See e.g.*, AR 6074-133. Research shows that salinity affects the types of organisms that are present, changing the ecology of water bodies and ecosystem services. AR 6037. Benthic invertebrates[7] and some fish are very sensitive to salty pollutants.[9] *See e.g.*, AR 6074-133, AR 2103, *see also* AR 17060.

---

[4] A salt is a chemical compound with balanced positive and negative ions. A common example is table salt (sodium chloride); common dissolved salts include chloride, sodium, sulfate, calcium, magnesium, and potassium.

[5] Salinity is the saltiness or total concentration of dissolved salts in water.

[6] Record citations refer to the administrative records ("AR") filed in Civil No. 22-1783

[7] Benthic macroinvertebrates are small aquatic animals and insects, such as water flea, worms, and beetles.

Excessive salinity can kill benthic invertebrates that provide food for fish, resulting in both a reduction in the size of fish and fewer fish in the waters. *Id.*

Specific conductance is a parameter used to measure salinity or total dissolved salts which include, among others, sulfate, chloride, nitrate, and phosphate. EPA, National Aquatic Resource Surveys, Indicators, Conductivity, https://tinyurl.com/2p8urtk5. As the concentration of salts and other inorganic chemicals in a waterbody increases, conductivity increases, indicating increased water toxicity that can be harmful to aquatic life and aquatic plants. *Id*. *See e.g.*, AR 6074-133, AR 2103.

Sulfate is a salt that when discharged into waterbodies can transform into sulfide—a compound that can destroy wild rice by attaching to the plant's roots, preventing growth and limiting reproduction. AR 7159, AR 18771. Sulfide can wipe out entire rice beds and significantly decrease the probability of wild rice growing in those waterbodies. AR 18916.

Minnesota waters have been plagued by excessive sulfate, largely due to industrial discharges. *See* AR18794 (as of in 2018, 13 of the top 16 sulfate dischargers to wild rice waters were industrial), AR18794. In 2021, EPA overrode the state and listed 32 waterbodies in Minnesota as impaired for wild rice, meaning that those waters did not meet water quality standards necessary to protect this essential plant. *See,* Press Release, EPA Region 5, EPA Transmits Addition of 32 Waters to Minnesota's 2020 Impaired Waters List ("EPA Impaired Waters Press Release") (Nov. 9, 2021), https://tinyurl.com/2fwvp6b5. Tribes had long pushed for this result. *See id.* at Attach. 3: Resp. to Cmts. Raised During Consultation (detailing tribal comments).

While excessive sulfate can on its own be toxic to aquatic life like benthic invertebrates and other sensitive organisms that are critical to the water ecosystem, the compound can also increase the amount of mercury in water and in turn increase toxic methylmercury pollution.  *See* MPCA, St. Louis River Watershed Identification Report*,* [St. Louis River Stressor Rep.] p. 41, Table 9 (Dec. 2016), https://tinyurl.com/4j4d5stm; AR 71161-5.  Sulfates released into peat environments like those throughout northern Minnesota increase the transformation of elemental mercury into methylmercury.  AR 71161-5.  Methylmercury is a highly toxic form of mercury created when elemental mercury bonds with and is converted to methylmercury by anoxic bacteria in waterbodies.  *Id*.  This highly toxic form of mercury is easily taken up by plants and animals, bioaccumulating in the food chain.  *Id*.  At the top of the food chain, humans who eat methylmercury-contaminated fish are particularly vulnerable—and it has long been recognized that Native people eat more fish than the general populations.  *Id*.; *see also* Background Sec. II, *supra*.  "Even lower-level exposure can result in . . . poor concentration, poor memory, speech, and language disorders, and decrease in visual-spatial skills in children exposed to methylmercury in utero.  Fetuses, infants, and young children are four to five times more sensitive to the adverse effects of methylmercury exposure than adults."  AR 7894-7901.

Another salty or ionic pollutant threatening the health of Minnesota's waters is chloride.  High chloride concentrations can interfere with the ability of lakes to mix or turnover by forming a concentrated layer or chemocline.  Seasonal mixing of an entire lake water column redistributes oxygen and nutrients from the lower levels to the rest of

the water. AR 7627-8. Disruption of lake mixing can lead to the absence of oxygen at the bottom of lakes that then causes heavy metals and excessive nutrients to be released from sediments into the water column. This release can kill aquatic insects and fish as well as produce toxic algal blooms. *Id*. AR 7628-9. Once in the water, chloride also becomes a permanent pollutant and continues to accumulate over time. *Id*. More than 58% of Minnesota's wetlands are in poor condition due to chloride contamination. *Id*. AR 7630.

The proliferation of salty pollutants in Minnesota's waters from industrial discharges have severely diminished the ability of the Bands to exercise their reserved rights to fish and harvest wild rice. *See*, Howes and McCormick Decls. For example, the St. Louis River Estuary was once a prime source of walleye for Bandmembers but is now among the waterbodies with the highest mercury content in its fish because of industrial pollution. Bandmembers have forgone fishing in the waterbody. Howes Decl.[8] Fish like lake trout, walleye, and sturgeon have been so heavily harmed by habitat loss and pollution that Bandmembers can no longer readily rely on them as a resource. *See also*, McCormick Decl. Native people in Minnesota consume between 155,000 and 563,000 pounds of rice per year, but harvesting rice is more difficult as waterbodies for wild rice

---

[8] From 2007-2011, the Minnesota Department of Health conducted a study of "Mercury in Newborns in the Lake Superior Basin." In this study, 10% of the newborns in Minnesota's Lake Superior region had mercury levels above the EPA mercury-safe dose limit. McCann, Mercury Levels in Blood from Newborns in the Lake Superior Basin Final Report Nov. 30, 2011, https://www.health.state.mn.us/communities/environment/fish/.

have been harmed or fully poisoned by pollution such as excess sulfates.  Howes and

McCormick Decls.; *see also* EPA Impaired Waters Press Release,

https://tinyurl.com/2fwvp6b5.

### III.    EPA MUST ENSURE WATER QUALITY STANDARDS PROTECT DESIGNATED USES OF THE STATE'S WATERS.

Congress enacted the Clean Water Act to combat pollution threats to waterways

nationwide, with specific mandates to:

- restore and maintain the chemical, physical, and biological integrity of the Nation's waters:

- protect fish, shellfish, and wildlife; and

- prohibit the discharge of toxic pollution in the Nation's waters.

33 U.S.C. §§ 1251(a) and 1313(c)(2)(A).  To achieve these objectives, Congress directed

states to develop water quality standards that define the desired condition of a water body

and establish measures to attain that condition.  33 U.S.C. § 1313(c)(2).  The Clean Water

Act requires water quality standards to include the designated uses in a state's waters and

water quality criteria necessary to protect those designated uses.  33 U.S.C.

§ 1313(c)(2)(A) and 40 C.F.R. § 131.11(a)(1).  Designated uses establish the

environmental objectives for a waterbody that must be protected, such as public water

supplies, propagation of fish and wildlife, consumption of fish, and recreation.  *Id*. at

1313(c)(2)(A) and 40 C.F.R. § 131.3(f).  Water quality criteria set pollutant limits or the

minimum conditions necessary to ensure that the designated uses in a waterbody are

protected.  "When criteria are met, water quality will generally protect the designated

use." 40 C.F.R. § 131.3(b).  Water quality criteria for waters with multiple use

designations must support the most sensitive use.  40 C.F.R. § 131.5.

States are required to establish water quality criteria based on sound scientific

rationale.  *Id*. at § 131.11(a).  While water quality criteria can be numeric or narrative,

EPA regulations explicitly instruct states to adopt narrative water quality criteria *only if*

*numeric criteria cannot be established* or to supplement numeric criteria.  *Id*. at

§ 131.3(b) (emphasis added), *see also* AR 17516.  States must consider and ensure that

all designated uses—those instream and those downstream from a pollution source—are

maintained, and tribal resources are protected when developing or modifying water

quality standards.  33 U.S.C. § 1313(c)(2), (3); 40 C.F.R. §§ 131.5(a)(2); 131.11(a), (b)

and (e); *see also* 87 Fed. Reg. at 74364-74365.

Once states develop new or revised standards, they must submit the standards to

EPA for review, 33 U.S.C. § 1313(c)(2) along with the "[m]ethods used and analyses

conducted to support water quality standards revisions." 40 C.F.R. § 131.6(b).  EPA must

analyze and ensure that the new or revised water quality standards protect instream and

downstream designated uses, preserve tribal reserved rights, and are scientifically

defensible.  33 U.S.C. § 1313(c)(2), (3); 40 C.F.R. §§ 131.5(a)(2); 131.11(a).  EPA must

ensure that water quality standards are adequate to protect tribal reserved rights:

> Where tribes have reserved rights to aquatic and/or aquatic-
> dependent resources, protection of such rights falls within the ambit
> of the [Clean Water Act's] directives and objectives and is consistent
> with EPA's longstanding general approach to implementing [Clean
> Water Act] section 303(c), including through adoption and revision
> of its [Water Quality Standards] regulation.

10

87 Fed. Reg. at 74364. *See also* 33 U.S.C. § 1371(a)(3) (providing the Act "shall not be construed as . . . affecting or impairing the provisions of any treaty of the United States."); EPA Adm'r Mem. (Dec. 1, 2014) (affirming "EPA must ensure its actions do not conflict with tribal treaty rights"), https://tinyurl.com/bdfd4ew4.

If EPA disapproves a new or revised standard, the state has 90 days to correct it, and if the state does not, EPA must propose standards to meet the requirements of the Act. 33 U.S.C. § 1313(c)(3) and (4).

## IV. MINNESOTA'S WEAKENING OF LONGSTANDING NUMERIC WATER QUALITY CRITERIA.

Minnesota has seven classes of designated uses of the state's waters, including: Class 2 Aquatic Life and Recreation uses, Class 3 Industrial uses, and Class 4 Agriculture and Wildlife uses. Minn. R. 7050.0140. Weakening Certain classes of beneficial uses are further divided into subclasses with different water quality standards like Class 4A Agriculture, including wild rice. Minn. R. 7050.0224 Subpart 2.

For more than fifty years, Minnesota has applied EPA-approved numeric criteria for salty pollutants like total dissolved salts, chlorides, and sulfates to protect industrial (Class 3) and agricultural (includes irrigation (Class 4A) and wildlife (Class 4B)) uses of water. Numeric criteria were also set for specific conductance, which is a measure of salinity or the total concentration of dissolved salts in the water. Minn. Reg. Water Pollution Control ("WPC") 14, Criteria for the Classification of the Intrastate Waters of the State and the Establishment of Standards of Quality and Purity (1967); Minn. Reg. WPC 15, Criteria for the Classification of the Interstate Waters of the State and the

Establishment of Standards of Quality and Purity (1967).  Minnesota revised its water quality standards in 1973 to include a numeric sulfate standard of 10 mg/L to protect wild rice, which EPA approved.  *See* State Water Quality Standards; Adoptions and Approvals; Minn.; WPC 14 and WPC 15, 42 Fed. Reg. 56789 (Oct. 28, 1977), https://tinyurl.com/4tbyc4eb.

In 2021, after years of pressure by industrial interests for looser water quality standards, and over the objections of tribes and members of the public, Minnesota weakened the longstanding numeric criteria that applied to industrial and agricultural uses.  *See, e.g.,* U.S. Steel to MPCA (Oct. 2, 2017) (Minntac's proposal to cease litigation over its taconite operation included a request that "[the Minnesota Pollution Control Agency ("MPCA")] will prioritize revisions of Class 3 and 4 water quality standards . . ..."), AR 8570, AR 902, AR 18658, (affirming "Cliffs and others in the regulated community have reviewed and commented on the technical support for amending the [industrial and agricultural] rules for over a decade."), AR 191013.  The State replaced many enforceable and objective numeric criteria with less protective, subjective narrative criteria and site- and withdrawal-specific "translators" that do not protect other instream or downstream uses and would rarely, if ever, result in effluent limits.[9]  *See* Minn. R. 7050.0223 and Minn. R. 7050.0224; AR 1175, AR 1183.

According to the State, "the overall effect of the rulemaking is to reduce the cumulative effect or burden of treating wastewater to reduce salts in the discharger."

---

[9] Neither the Industrial (AR 1182) or Irrigation Translator (AR 1192) set any equation, method, or algorithm by which an effluent limit could be seen.

AR 969.  Those discharges are primarily industrial and related to mining.  AR 944

(waters discharged from taconite operations have " . . . elevated concentrations of major

ions with the ionic composition dominated by magnesium, calcium, bicarbonate and

sulfate."); *compare id.* (all other industries' discharge levels grouped in single chart),

*with id.*, AR 945-7 (showing widespread exceedances of former standards by taconite

operations); *see also* AR 18794 (MPCA data showed 13 of the top 16 sulfate dischargers

to wild rice waters were industrial—10 of those being mining operations).

As part of the 2021 revision, Minnesota also changed how it applied the new water

quality standards, assessing compliance only at the point an industrial user withdrew

water from a waterbody for use and not at the point of pollutant discharge or anywhere

within the waterbody itself downstream of the pollutant discharge.  *See, e.g.*, Minn. R.

7053.0205 Subpart 7(D), (E); 7053.0260 Subpart 3 (D); 7053.0263 Subpart 3(B).

The State claimed the impetus for revising the standards was twofold: (1) the wide

range of water quality needs of Minnesota's industries where some appropriators are

willing to accept water of lower quality; and (2) the lack of documentation supporting the

scientific basis for the original numeric standards that is line with the level of rigor that is

standard today.  AR 13903, 13899, 13916, 5601-6.

V.    THE POTENTIAL ADVERSE IMPACTS FROM MINNESOTA'S
      WEAKENING OF WATER QUALITY STANDARDS.

Minnesota acknowledged that an increase in salty pollution from weakening and

removing numeric criteria for industrial and agricultural uses could "cause problems for

aquatic life." AR 851.  The State even recognized "that there is peer-reviewed academic

13

literature finding that the parameters included in [the Revised Water Quality Standards] can have impacts on aquatic life." AR 1619. But instead of analyzing the potential impacts to aquatic life that could occur from eliminating numeric criteria for industrial and agricultural uses, Minnesota claimed that "the consideration of aquatic life beneficial use is not relevant" because the rulemaking "focuses on revisions to [industrial and agricultural] standards." AR 822. The State did not assess the revised industrial and agricultural standards' impact on wild rice despite recognizing that aquatic plants like wild rice are sensitive to specific conductance, chloride, and sulfate. *See*, AR 992. Minnesota also did not consider the effects the revisions to industrial and agricultural standards would have on treaty-reserved rights in the waters that flow through and surround the Ceded Territories in Minnesota. AR 2996 (claiming that "[p]rotection of the resources that commenters have described as being important treaty resources—such as aquatic life and wild rice—are outside the scope of this rulemaking, or insufficient evidence."). Not only are these analyses required by federal law, but there is evidence in the record indicating that increases in salty pollutants allowed by Minnesota's Revised Water Quality Standards *will* affect the waters that support aquatic life and wild rice.

The Revised Water Quality Standards allow for increased conductivity in Minnesota's waters that are well above thresholds found protective of aquatic life and wild rice. AR 6423-71, 6472-514. EPA's benchmark study on the impact of specific conductivity on aquatic life demonstrates that biological impairment occurs at 300 uS/cm. AR 6074-133. A 2015 Johnson and Johnson report (supported by EPA's independent analysis) determined that a specific conductance concentration of 329 uS/cm would not

protect aquatic life in northeastern Minnesota.  AR 6423-71, AR 6472-514.  At 509

uS/cm, forty percent of fish species are less likely to occur.  Brook trout are among the

most sensitive fish species to specific conductivity with only a twenty percent chance of

seeing them in waters at 300 uS/cm.  AR 2103. Minnesota's own analysis concluded that

a preliminary concentration of conductivity expected would kill wild rice at 407 uS/cm

and 398 μS/cm in the mixed wood plains ecoregion.  AR 992.  The narrative translator

that Minnesota adopted would allow conductivity of up to 3,000 uS/cm.  AR 1190.

Minnesota's revisions also presumptively allow a site-specific concentration of

1,000 mg/L of sulfate in any waterbody not used for cattle, which is a concentration that

far exceeds the toxicity threshold for aquatic life and the state's 10 mg/L water quality

standard for wild rice.  AR 867-7; Minn. R.7050.0224, subp. 2.  Studies have established

direct sulfate toxicity to benthic invertebrates at concentrations as low as 124 mg/L in

(soft) waters, such as those found in northeastern Minnesota.  *See* St. Louis River

Stressor Rep, p. 41, Table 9, https://tinyurl.com/4j4d5stm.  Excessive sulfate also

increases methylmercury bioaccumulation.  AR 7162-5.  MPCA scientists confirmed this

in a study that found the addition of sulfate to more than double the amount of mercury

released from sediments to water.  AR 7165, 18939-40.  Additionally, sulfate triggers the

decomposition of plants, releasing phosphorus and nitrogen (nutrient pollutants) from

sediments.  AR 7166.  Under experimental conditions, sulfate levels of 300 mg/L

increased nitrogen by 80% and increased phosphorus availability in sediment pore water

more than seven-fold.  *See*, AR 2214-30, Table 1 at AR 2775.  The release of these

nutrients can cause eutrophication, depleting oxygen in the bottom water, which can

cause fish kills.  AR 7166.  Excessive nutrients also result in algae blooms, which make water unsuitable for swimming and recreation.  *Id*.  Below is an illustration of the harm sulfate pollution perpetuates. AR 7163.



Figure 1. Diagram of the effects of microbial sulfate reduction in the muddy sediments of a waterbody. P = phosphorus, N = nitrogen, Hg = mercury. LEFT: The "natural" situation where lack of oxygen in the mud at the bottom of the waterbody retards the decomposition of organic matter in the mud, effectively "locking away" the components of that organic matter. An aquatic plant is depicted growing in the mud. RIGHT: The cascade of effects that occurs when sulfate is added to the waterbody. Under anoxic conditions, a process called "microbial sulfate reduction" converts sulfate to sulfide, which is toxic. Microbial sulfate reduction also releases mercury, nitrogen, phosphorus, and alkalinity from the mud, and converts mercury to methylmercury (the only form of mercury that accumulates in the food web). Each of these pollutants is currently regulated by the State of Minnesota, and can, in turn, have effects upon wildlife, plants that provide wildlife habitat, water quality, and human health.  Adapted from Friends of the Boundary Waters Wilderness, 2020, Comments on the Twin Metals Mine Plan of Operations.

As for the revised chloride standard, it allows chloride concentrations that are well above the naturally low background level of chloride of about 1 or 2 mg./L in northeastern Minnesota.  AR 8092 (Introduction), 8123 (Table 6).  Native aquatic species are intolerant of such increases.  Disruptions to lake mixing, which can impair aquatic life and lake ecology, have been documented in Twin Cities lakes with chloride concentrations as low as 100 mg/L.  AR 7630.

The record also contains information concerning the challenges Minnesota has faced in implementing its water quality standards program.  This information includes, among other things, the state's documented difficulty in enforcing narrative criteria as

well as the narrative and numeric wild rice sulfate standard,[10] allowance of outdated

permits without prior limits to stay in effect,[11] and issuance of National Pollutant

Discharge Elimination System ("NPDES") permits without effluent limits to ensure

compliance with water quality standards.[12]

## VI.    DESPITE CONCERNS ABOUT ADVERSE IMPACTS, EPA APPROVED MINNESOTA'S WEAKENING OF LONGSTANDING NUMERIC WATER QUALITY CRITERIA

Minnesota submitted the Revised Water Quality Standards to EPA for approval, as

the Clean Water Act requires.  AR 3499.  Over the objections of tribes and members of

the public, EPA approved the standards.  AR 3947; *see also* AR8821.  EPA took this

action without considering:

- whether there is an explanation or record-based rationale or

  scientific rationale to suggest that Minnesota's numeric criteria are

  infeasible;

---

[10] Minnesota has only set effluent limits based on the 10 mg/L wild rice sulfate standard for U.S. Steel Keetac mine.  AR 7697.  Monitoring reports from show Keetac's sulfate discharge far exceeds the permit limits.  AR 7828.

[11] *See*, *e.g.*, AR 8445 (requiring MPCA to submit to EPA within one month an updated schedule for issuance of expired NPDES permits for metallic mining operations after reports of MPCA refusing to address such permits).

[12] *In re. Reissuance of NPDES/SDS Permit to U.S. Steel Corp. for Minntac Facility*, 937 N.W.2d 770, 787-88 (Minn. App. 2019), *partially rev'd on other grounds*, 952 N.W.2d 572 (Minn. 2021) (remanding MPCA's first reissued NPDES permit for a metallic mine due to lack of effluent limits despite substantial evidence of ongoing surface water discharges causing exceedances in downstream wild rice and other waters).  MPCA's finalized permit for Polymet included no effluent limits for sulfate or monitoring of sulfate discharge to ensure that wild rice waters were protected.  AR 7835.

- the scientific record demonstrating that Minnesota's revisions relaxing industrial and agricultural water quality standards will affect instream and downstream waters with aquatic life, wild rice, and tribal reserved resources; and

- the challenges that Minnesota has faced with implementing and enforcing its existing water quality standards, including numeric and narrative standards.

*See* AR 3903. EPA also admitted that it is "without knowledge" about whether Minnesota examined downstream impacts on wild rice and aquatic life. EPA Answer at ¶¶ 32, 35-36. EPA did not ask for this analysis or do its own independent analysis, opting instead to rely on Minnesota's conclusory assumptions. AR 3927-32, *see e.g.* AR 14304 (email from David Pfeifer Chief, Watersheds and Wetlands Branch at EPA Region 5 proclaiming that the Revised Water Quality Standards do not affect the wild rice standard on December 14, 2020, the same day the standards were released for public comment in Minnesota).

## STANDING

Plaintiffs Grand Portage and Fond du Lac are sovereign, federally recognized Indian tribes with reservations in northern Minnesota, a region where they have lived for centuries. The Grand Portage Reservation is located along Lake Superior in Cook County near the tip of Minnesota's Arrowhead Region. The Fond du Lac Reservation is adjacent to Cloquet, Minnesota, and is bordered on the north and east by the St. Louis River. Numerous surrounding wetlands, lakes, and streams are connected to the waters

that flow through and around Grand Portage and Fond du Lac Reservations.  Howes
Decl. at ¶¶ 5-10; McCormick Decl. at ¶¶ 7-12.  The Bands retain treaty-reserved rights to
fish and harvest wild rice in waters that flow throughout their Reservations and the lands
they ceded through treaties.  *See* Background at Sec. II, *supra*.

The Bands have an existential interest in protecting Minnesota waters and their
treaty-reserved rights to hunt, fish, harvest wild rice, and gather food and plants because
the Bands members rely on those natural resources for subsistence, economic, cultural,
medicinal, and spiritual purposes.  *See* Howes Decl. at ¶¶ 2, 5, 9-11, 13, 18-24;
McCormick Decl. at ¶¶ 2, 6-13.  Salty pollutants like sulfate adversely affect fish, wild
rice, and wetlands—all treaty resources on which the Bands rely.  Howes Decl. at ¶¶ 5, 9-
24; McCormick Decl. at ¶¶ 10-13.  EPA's approval of Minnesota's revised water quality
standards directly threatens and adversely affects the Bands and their members' ability to
protect and use waters on their reservations and to fully exercise their treaty-reserved
rights, which the agency and the U.S. Government must safeguard.  *Id.*

Minnesota's Revised Water Quality Standards weaken numeric criteria for waters
designated for industrial and agricultural use, which will affect waters with more
protected use classes and put at risk wild rice, fish, and other aquatic life that the Bands
and their members rely on for subsistence and cultural purposes.

## STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine disputed issues of
material fact.  Fed. R.Civ.P. 56; *Cent. Platte Nat. Res. Dist. v. U.S. Dep't of Agric.*, 643

F.3d 1142, 1146 (8th Cir. 2011).  This case concerns judicial review of a final agency

action based, with review confined to the administrative record.

Courts must set aside an agency action that was "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A), *see also*

*Sierra Club v. EPA*, 252 F.3d 943, 947 (8th Cir. 2001).  "The requirement that agency

action not be arbitrary or capricious includes a requirement that the [EPA] adequately

explain its result[.]" Public *Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993).

Agencies are required to "examine the relevant data and articulate a satisfactory

explanation for its action including a rational connection between the facts found and the

choice made."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,

463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156

(1962).  *See also Transmission Agency of N. Cal. v. FERC*, 628 F.3d 538, 543-44 (D.C.

Cir. 2010) (agency must "address contrary evidence in more than a cursory fashion").

An agency action is arbitrary and capricious if the agency relied on factors

Congress did not intend it to consider, failed to consider an important aspect of the

problem, offered an explanation for its decision that runs counter to the evidence before

the agency, or the decision is implausible.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc.,* 463

U.S. at 43.

EPA's approval of Minnesota's Revised Water Quality Standards should be set

aside for at least two reasons.  First, EPA violated the Clean Water Act by approving

Minnesota's Revised Water Quality Standards without analyzing and ensuring that the

removal of numeric criteria for industrial and agricultural uses would not adversely affect

treaty-reserved resources and downstream uses within Minnesota waters.  Second, EPA

acted arbitrarily and capriciously when it approved Minnesota's Revised Water Quality

Standards without providing a scientific rationale or reasoned record-based explanation

for its decision.  Not only does the record contain information contrary to EPA's

decision, but EPA failed to consider this information.

ARGUMENT

I.    EPA'S APPROVAL OF MINNESOTA'S REVISED WATER QUALITY
      STANDARDS IS CONTRARY TO THE CLEAN WATER ACT AND
      IMPLEMENTING REGULATIONS.

EPA violated the Clean Water Act and its own regulations by approving

Minnesota's Revised Water Quality Standards, removing specific numeric criteria for

several pollutants, and replacing them with general narrative criteria without a record-

based or scientific rationale, and without an explanation for its disregard of important

factors and record evidence.  There's nothing in the record demonstrating that

Minnesota's numeric criteria are infeasible—a bar its own regulations set for the adopting

narrative criteria.  EPA also approved Minnesota's removal of numeric criteria without

any analysis about the impact on downstream water uses, the most sensitive instream uses

of those waters, and tribal reserved resources, which means that EPA did not ensure that

Minnesota's designated uses would be protected.  33 U.S.C. § 1313(c)(3); 40 C.F.R.

§ 131.10(b).

21

A.    <u>The Clean Water Act Mandates That Water Quality Standards Include Criteria That Protect the Designated Uses of Minnesota's Waters.</u>

The Clean Water Act directs states to establish water quality standards that include water quality criteria, which are a metric that states are required to develop to identify and ensure that designated uses within a waterbody like the propagation of wild rice or consumption of fish are protected. 33 U.S.C. § 1313(c); 40 C.F.R. §§ 131.11(a), 131.2.

When promulgating new or revised criteria, EPA's regulations instruct states to adopt narrative criteria only if numeric criteria cannot be established or to supplement numeric criteria. *Id*. at § 131.11(b). States must also consider and ensure that other instream and downstream designated uses are maintained and that tribal reserved rights are protected. *Id.* at § 131.10(b); Water Quality Standards Regulatory Revisions to Protect Tribal Reserved Rights, 87 Fed. Reg. 74361, *et seq*. (Dec. 5, 2022). Water quality criteria must be based on sound scientific rationale and support the most sensitive waters with multiple use designations. 40 C.F.R. §§ 131.5(a)(2); 131.11(a).

After states submit their standards to EPA for review, EPA can only approve the new or revised standards if they meet all the Clean Water Act requirements, including ensuring the maintenance of instream and downstream designated uses, preservation of tribal reserved rights, and that the standards are based on scientifically defensible rationales. *See*, 33 U.S.C. §§ 1313(c)(2)-(3), 1371(a)(3); 40 C.F.R. §§ 131.5(a)(2); 131.10(b); 131.11(a); 87 Fed. Reg. 74361, *et seq*. (Dec. 5, 2022).

B.     EPA Ignored Clean Water Act Regulations That Numeric Criteria Should
       Be Adopted Whenever Possible When It Approved Minnesota's Revised
       Water Quality Standards.

Minnesota's Revised Water Quality Standards roll back specific numeric

protections to general narrative standards.  EPA's approval of these standards cuts against

the agency's own regulation that calls on states to adopt numeric criteria when they can

be established, which in this case is evidenced by the fact they were previously in place.

40 C.F.R. § 131.11(b).  Numeric criteria set quantifiable concentrations or levels of

pollutants that can be present in a waterbody and protect the designated uses of that

waterbody.  AR 810.  Narrative criteria describe desired water quality conditions for a

waterbody but contain no quantitative values and lack specificity.  *Id*.  EPA's regulations

explicitly direct that "[i]n establishing [water quality] criteria, States should:

> (1) Establish numerical values based on:
>     (i)    304(a) Guidance; or
>     (ii)   304(a) Guidance modified to reflect site-specific
>            conditions; or
>     (iii)  Other scientifically defensible methods;
>
> (2) Establish narrative criteria or criteria based upon biomonitoring methods
>     *where numerical criteria cannot be established or to supplement numerical
>     criteria*.  40 C.F.R. § 131.11(b) (emphasis added).

Narrative criteria should only be adopted when numeric criteria cannot be established or

to supplement numeric criteria.  Courts have recognized this language in EPA's

regulations as meaning "states should develop either numerical criteria based upon

[Clean Water Act] guidance or other scientific methods or narrative criteria if numerical

criteria cannot be established.  Narrative criteria might also be developed to supplement

numerical criteria."  *Nat. Res. Def. Council, Inc. v. US EPA*, 16 F.3d 1395, 1400, 1404-05

(4th Cir. 1993); *Nw. Envtl. Advocates v. US EPA*, 855 F. Supp. 2d 1199, 1217-18 (D. Or. 2012).

In *Northwest Environmental Advocates*, the district court found that EPA violated the Clean Water Act by approving Oregon's narrative criteria when numeric criteria could be established (as evidenced by the fact that they were already in place)—precisely the situation here. *Id*. at 1217-18. In reaching this conclusion, the court pointed to EPA's regulations that direct states to establish narrative criteria "'where numerical criteria cannot be established or to supplement numerical criteria.'" *Id*. (quoting 40 C.F.R. § 131.11(b)(2)). The court explained that approving the narrative criteria wrongly allowed the state to replace, not supplement, the numeric criteria with a less-protective standard. *Id*.

The same result is warranted here. EPA approved Minnesota's Revised Water Quality Standards without providing an explanation, record-based, or scientific rationale to show that Minnesota's numeric criteria are infeasible. Further, the very existence of previously developed numeric criteria demonstrates that numeric criteria *are* possible for these pollutants. MPCA's alleged reason for its revisions are that "the diversity of water quality needs for industrial and irrigation use means that identifying protective numeric values for each potential pollutant necessary to protect various wide-ranging industrial and irrigation uses is unreasonable to complete on a statewide basis." AR 802. This rationale is not a scientific basis for eliminating the state's numeric criteria for several pollutants and parameters, and it is not compliant with applicable law. The state also did not explain why it chose to *eliminate* rather than *update* the numeric criteria.

24

Moreover, the 2010 University of Minnesota study on industrial and agricultural standards—the study purportedly relied on by MPCA for the Revised Water Quality Standards—recommended *maintaining* some of Minnesota's existing numeric standards, which the state nonetheless eliminated. AR 1310. This same study also recommended that Minnesota *maintain* the state's existing numeric standard for sodium, but the state eliminated it too. *Id*. The 2015 study conducted to gauge the importance of the water quality standards for industrial appropriators, that underpins the state's decision to eliminate numeric criteria for industrial uses, is thin on data as it included 18 responses from industrial appropriators when there are a total of 902 industrial appropriators in the state—less than 2%. AR 1038, 5598.

Although 40 C.F.R. § 131.11(b) provides states with some flexibility to develop water quality criteria, this flexibility is not limitless and is not a license to *weaken* water quality standards, especially for convenience or cost reductions for polluters as it appears Minnesota has done here. Minnesota admits that "…these changes will likely result in fewer and less restrictive limits in permits, thereby decreasing the cost of complying with [industrial and agricultural] water quality standards." AR 909. The State concedes that the cost of compliance was the driver for its decision to eliminate numeric criteria for industrial and agricultural uses. *See, e.g.*, AR 1025 (noting that Minnesota ". . . has received comments from industrial and municipal wastewater dischargers about the substantial economic hardship that complying with the current numeric standards (Chloride, hardness, pH) has already caused and will cause in the future if these standards are not updated."). The Clean Water Act and EPA's own regulations require designated

uses to be protected based on sound scientific rationale, not on the polluters' appetite to pay for that protection.

      C.    <u>EPA Approved Minnesota's Revised Water Quality Standards Without Properly Analyzing Impacts to Other Instream and Downstream Water Quality Standards.</u>

     Neither Minnesota nor EPA analyzed the impact of removing numeric criteria for industrial and agricultural uses on the state's waters, particularly downstream waters that support aquatic life and aquatic plants like wild rice. By approving Minnesota's Revised Water Quality Standards without this analysis, EPA failed to meet its oversight responsibilities under the Clean Water Act. The Clean Water Act and implementing regulations are explicit that EPA cannot approve a new or revised water quality standard without considering the impact on stream systems as a whole—including downstream— and ensuring that the modified water quality criteria preserve all designated uses. 33 U.S.C. § 1313(c)(3), 40 C.F.R. §§ 131.5(a)(2); 131.11(a); 131.6(b), 131.10(b). *See also Anacostia Riverkeeper, Inc. v. Jackson*, 798 F. Supp. 2d 210, 229 (D.D.C. 2011) (stating that regulations instruct states to consider "all water quality criteria… to ensure that all designated uses are preserved); *W. Va. Rivers Coal. v. E.P.A.*, No. CIV A 03-1022 2014 WL 354327 at *7 (E.D. Pa. Jan 14, 2004) (EPA was required to consider impact on recreational use when approving water quality standards for the protection of human health); Answering Brief for Federal Defendants at 34-5, *El Dorado Chem. Co. v. U.S. E.P.A.*, 763 F.3d 950 (8th Cir. 2014) (No. 13-1936), 2013 WL 3989862 (C.A.8), *34-5.

     Ensuring that water quality criteria provide for the attainment and maintenance of downstream water quality standards is important to:

- avoid situations where downstream segments become impaired due, either in part or exclusively, to pollution sources located in upstream segments;

- limit or avoid resource-intensive water quality problems and legal challenges that can occur after the adoption of uses and criteria that lack consideration of downstream waters' water quality standards; and

- prevent the shifting of responsibility for pollution reductions from upstream sources and jurisdictions to downstream sources and jurisdictions.

EPA, Protection of Downstream Water Quality Standards: Frequently Asked Questions ("EPA Downstream Water Quality FAQ") (June 2014), AR 17371-2.

Here, Minnesota and EPA failed to do the required due diligence to ensure protection of aquatic life and wild rice when the state revised water quality standards for industrial and agricultural uses. Minnesota admitted that "[t]o date, the MPCA has not assessed any of the narrative or numeric water quality standards that exist for the [industrial and agricultural] beneficial uses." AR 816. Nor did EPA scrutinize Minnesota's analysis or conduct its own independent analysis to ensure that downstream water quality standards would be preserved. In fact, EPA admitted that it is "without knowledge" about whether Minnesota examined downstream impacts on wild rice and aquatic life. EPA Answer at ¶¶ 32, 35-36. Both Minnesota and EPA ignored general considerations that the agency itself recommends for analyzing and ensuring that water

27

quality criteria maintain the maintenance of downstream water quality standards. There was no consideration or analysis of the interaction between both point and nonpoint source discharges and downstream impacts to aquatic life and wild rice. AR 17581. There was no consideration or analysis of the fact that downstream aquatic life and wild rice may not be affected by the same physical or other limitations as the upstream uses. *Id*. There was no inventory or map identifying uses, particularly tribal uses, within a watershed to define and understand the scope of potential downstream vulnerabilities. AR 17372. There was no consideration or analysis of the spatial extent of potential impacts on downstream aquatic life and wild rice, which should be considered as far downstream as adverse impacts are observed or expected to occur from upstream pollution. *Id*., AR 17374.

Nothing in the Clean Water Act or implementing regulations allow Minnesota and EPA to disregard the impact that revisions to a water quality standard will have on downstream waters, the very antithesis of the statute's objective to achieve water quality that is "fishable" and "swimmable" in the Nation's waters. 33 U.S.C. § 1251(a)(2).

      1.    *The record is replete with evidence of the potential for adverse impacts to aquatic life from pollutants.*

Minnesota acknowledged "that there is peer-reviewed academic literature finding that the parameters currently included in the [Revised Water Quality Standards] can have impacts on aquatic life."[13]  AR 1619.  The State also admitted that salt pollutants "cause

---

[13] *See e.g.*, AR 6472-514, AR 6382-6 (explaining and citing studies that show that the former standards were protective of aquatic life).

problems for aquatic life—including macroinvertebrates and plants." AR 851. Yet, with little to no analysis, Minnesota decided that it "[would] not address the aquatic life impacts . . . within" its rulemaking to remove numeric criteria. AR 1619. The Clean Water Act requirements do not allow States to pick and choose what they analyze, and they do not allow EPA to rubberstamp state water quality standards with scant analysis on the potential impact to aquatic life as the agency did here.

      a.    The adverse impact to aquatic life from the increased specific conductivity the revised standards allow.

Minnesota and EPA should have considered the potential impact of eliminating the water quality standard for specific conductance on aquatic life. Specific conductivity is a surrogate measure of salinity or total concentration of dissolved salts in water and is calculated by the ability of the water to transmit an electrical current. EPA, National Aquatic Resource Surveys, Indicators, Conductivity, https://www.epa.gov/national-aquatic-resource-survey s/indicators-used-national-aquatic-resource-surveys. Because dissolved salts conduct electrical current, conductivity increases as the concentration of salts in the waterbody increases—indicating the toxicity of the waterbody. *Id.* Conductivity increases are tied to aquatic life impairment—particularly some species of fish and macroinvertebrates that are known to inhabit low salt environments.

The removal of the numeric water quality standard for specific conductance will lead to increased salts in water that could kill aquatic life. Minnesota "estimates that no [point source] would receive a specific conductance effluent limit" under the new weaker standard, and that's accounting for the state's implementation of a narrative translator

that includes thresholds (3,000 uS/cm) that the agency itself estimates would kill over 95% of wild rice in a given water body.  AR 911-2, AR 1190.  Scientific studies on the impact of specific conductivity on aquatic life demonstrate that biological impairment can occur at levels an order of magnitude lower (300 uS/cm).  AR 6472-514 *see also*, *Ohio Valley Envt. Coal. v. Elk Run Coal co.*, 24 F. Supp. 3d 532, 561 (S.D.W. Va. 2014) (summary of 2011 EPA benchmark study where court relied on it to find that dischargers violated water quality standards for specific conductivity), AR 6051, AR 7627-8, AR 2103.  Minnesota and EPA disregarded the extensive research identifying specific conductance-related impairments to aquatic life and failed to analyze the effect that allowing conductivity to increase in the state's waters would have on aquatic life, especially benthic invertebrates and fish that are very sensitive to salts.

> b.    The adverse impact to aquatic life from increases in sulfate that the revised standards allow.

Minnesota and EPA overlooked the potential impact on aquatic life of allowing more sulfate into waters.  Because the Minnesota Revised Water Quality Standards would presumptively allow a site-specific concentration of 1,000 mg/L of sulfate in any waterbody not used for cattle, most of the sulfate increases will occur in the northeast where there are few to no cattle and where research shows that benthic invertebrates in that area are vulnerable to sulfate concentrations as low as 124 mg/L.  AR 827, 1147-8; St. Louis River Stressor Rep. at 41, Table 9, https://tinyurl.com/4j4d5stm.  This presumptive allowance is more than eight times the level that affects the most sensitive benthic invertebrates, in addition to the fact that some State waters already have elevated

sulfate concentrations as high as 751 mg/L. *Id*. at 305, Sec. 5.15.3. Neither Minnesota nor EPA evaluated the impact on aquatic life of allowing an increase in sulfate that is more than eight times the concentration that is toxic to benthic invertebrates, which are critical to the aquatic ecosystem.

Minnesota and EPA did not examine how aquatic life would be affected by allowing substantial increases of sulfate in waters, including in those waters already impaired by mercury. A study coauthored by MPCA scientists shows that adding sulfate to a maximum concentration of 300 mg/L more than doubles the amount of mercury released from sediments to water. AR 7165, 18939-40. Sulfate discharge has caused mercury levels in some northeastern Minnesota lakes to quadruple. AR 7389, citing US Geological Survey, Lake Levels and Water Quality in Comparison to Fish Mercury Body Burdens, Voyageurs National Park National Park, Minn. 2013-2015, https://tinyurl.com/mvez9fxy. According to MPCA's 2020 Impaired Waters List, 1,653 water bodies or stream segments have been identified as impaired due to mercury in the water column. MPCA, Minnesota's Impaired Waters List, https://tinyurl.com/2p9e9k4y.

        c.    The adverse impact to aquatic life from increases in chlorides that the revised standards allow.

Neither Minnesota nor EPA examined how aquatic life would be affected when the 50 mg/L and 100 mg/L criteria set for chlorides in waters used for industrial purposes are removed. Instead, both agencies concluded that removing the chloride numeric criteria for industrial uses would have no impact on aquatic life based solely on the fact that aquatic life is protected by a 230 mg/L chloride standard—a less stringent standard

31

than the one formerly applied for industrial use. *Compare* Draft AR 1621-22, 1649

(confirming former industrial chloride limit) *with* Minn. R. 7050.022 subp. 2 (aquatic life

chloride limit). Nothing in the Clean Water Act or implementing regulations allow

Minnesota and EPA to assume that aquatic life will not be harmed when removal of the

more stringent standard will result in higher concentrations of chlorides in the state's

waters and evidence in the record indicates that aquatic life will not be adequately

protected by the less stringent standard. *See*, 33 U.S.C. § 1313(c)(3); 40 C.F.R. §

131.10(b).

Minnesota and EPA should have analyzed how aquatic life would be affected

when the more stringent numeric chloride standard applied to protect industrial uses is

removed and higher chloride concentrations that could further stress aquatic life are

allowed. The state's surface waters have naturally low background levels of chloride,

and in northeastern Minnesota background levels of chloride are about 1 or 2 mg./L. AR

8123 Table 6. Minnesota's Revised Water Quality Standards would allow up to 60 times

more chloride in naturally low chloride waters—which will either impair or kill various

species native to these waters. AR 1190. *See e.g.*, AR 2103 (only a 20% chance of seeing

brook trout in waters with specific conductivity at 300 uS/cm).

MPCA and EPA also did not address that disruptions to lake turnover have

occurred in Minnesota lakes with chloride concentrations as low as 100 mg/L. *Id.*, AR

7629. As mentioned earlier, disruptions to lake turnover causes have metals and

excessive nutrients to be released from sediments into the water column, which can kill

benthic invertebrates and sensitive fish as well as produce toxic algae blooms. AR 7627-

31.  When MPCA studied wetlands in all of Minnesota's ecoregions in 2015, the agency concluded that 58.8% were in poor condition due to chloride contamination.  AR 7630. And before Minnesota relaxed its standards, 47 waterbodies have tested above the water quality standard for chloride, with an additional 39 surface waters near the chloride limit. Press Release, MPCA, 10 Smart Salting Tips that Protect Minnesota Water (Dec. 12, 2016), https://tinyurl.com/uk7ehc8u (on record with source).

Both Minnesota and EPA failed to consider how removing the more stringent and protective standard adopted for industrial use could further exacerbate waterbodies that are already above or close to the chloride limit and, in turn, further endanger aquatic life.

2.    *Minnesota and EPA had evidence of the potential adverse impacts to wild rice from the pollutants being deregulated.*

EPA cannot claim that wild rice will be adequately protected once numeric criteria for industrial and agricultural uses are removed, when neither Minnesota nor EPA analyzed the effect weakening the standard would have on wild rice.  Minnesota's Revised Water Quality Standards removed numeric criteria for pollutants that formerly applied to wild-rice waters *in addition to* the 10 mg/L sulfate standard that will remain in effect.  *See* EPA Answer at 15 ¶ 29; AR 863.  Minnesota and EPA acknowledge that aquatic plants are sensitive to salty pollutants.  AR 992, 3930.  EPA approved Minnesota's Revised Water Quality Standards for Industrial and Agricultural Uses without meaningfully analyzing the extent wild rice would be affected and failed to ensure that wild rice would be protected from the substantial increase in salts that these relaxed standards allow.

33

For example, Minnesota's removal of 1,000 uS/cm criteria set for specific conductance will allow for even more salts to be discharged in the state's waters, further threatening wild rice. The state's own analysis concluded that a preliminary concentration of conductivity would kill wild rice at 407 uS/cm and 398 μS/cm in the mixed wood plains ecoregion. AR 992. The narrative translator that Minnesota adopted to fill the gap after eliminating 1,000 uS/cm criteria set for specific conductance would allow conductivity of up to 3,000 uS/cm—almost an order of magnitude higher than what the agency itself estimates would kill 95% of wild rice in a given water body. *Id.*, AR 1190. The new limit on salts more than quadruples the salinity level previously allowed. AR 7621. EPA failed to consider how substantial increases in salts overall and resulting increases in conductivity allowed under the state's revised standards, would affect wild rice.

Sulfate, when discharged into waterbodies, can transform into sulfide, which can destroy entire rice beds and significantly decrease the probability of wild rice growing within those waters. Myrbo 2017 Wild Rice, AR 18916. As discussed above, Minnesota's revised standards would presumptively allow a site-specific concentration of 1,000 mg/L of sulfate in any waterbody not used for cattle. AR 827, 1147. A presumptive site-specific criterion of 1,000 mg/L would be widely available in northern and northeastern Minnesota where wild rice waters are located given feedlots are concentrated in the southern part of the state. AR 867-8, 1148. *See* 1854 Treaty Authority, 1854 Ceded Territory Resource Map (last visited May 1, 2023) (interactive map that shows location of wild rice waters within 1854 Ceded Territory),

34

https://tinyurl.com/3z8u45uc.  1,000 mg/l is a hundred times the amount that is protective of rice; allowing such an increase of sulfates would effectively destroy any chance of restoring older decimated rice beds, and it would likely contribute to the accumulation of sulfates in sediments resulting in long term damage to wild rice.  Minn. R.7050.0224, subp. 2 (10 mg/L numeric standard to protect wild rice).

Although Minnesota has a longstanding 10 mg/L sulfate standard for wild rice, neither the State nor EPA can claim that wild rice will be protected, especially when the agencies did not analyze, and therefore do not know, how wild rice will be affected by Minnesota's revisions that allow for more sulfate discharge into waters that flow and surround waters used for wild rice.  Minnesota and EPA do not know whether an increase sulfate discharge will make it harder for the wild rice standard to be considered.  Even before the state weakened its standards, EPA listed 32 waterbodies in Minnesota as impaired for wild rice due to sulfate levels.  EPA Impaired Waters Press Release, https://tinyurl.com/2fwvp6b5.  Neither Minnesota nor EPA examined how the state's revisions could impact the ability for the wild rice numeric standard to be met or enforced.

Moreover, these standards require compliance to be measured at the point an industrial or agricultural user withdraws water from a waterbody for use rather than at the point of discharge—meaning that there will no way to know the overall ambient health of the water for wild rice to ensure that it will be protected.  *See, e.g.*, Minn. R. 7053.0205 Subpart 7(D), (E); 7053.0260 Subpart 3 (D); 7053.0263 Subpart 3(B).

D.   <u>Neither Minnesota nor EPA Evaluated the Impact that the Revised Water Quality Standards Would Have on Tribal Reserved Rights as Required by The Clean Water Act.</u>

Minnesota and EPA failed to examine and ensure Minnesota's Revised Water Quality Standards protect tribal reserved rights, which encompass rights to aquatic and aquatic-dependent resources reserved or held by tribes. 87 Fed. Reg. at 74364. MPCA expressly admitted that it did not do so. AR 2996 (agency claimed that "[p]rotection of the resources that commenters have described as being important treaty resources—such as aquatic life and wild rice—are outside the scope of this rulemaking, or insufficient evidence is available."). EPA did a cursory review, at best, of tribal treaty reserved rights with little to no analysis or discussion beyond dropping a footnote in its review document. *See* AR 8821, AR 3925 n. 21, 3926-32.

As EPA itself has affirmed, federal law recognizes that treaty reserved rights are designated uses that must be protected by water quality standards. 87 Fed. Reg. at 74365. *See also* The Clean Water Act requires states to consider impacts on aquatic and aquatic-related treaty resources when promulgating water quality standards and for states to demonstrate how they have considered and protected treaty resources. *Id*. EPA also must consider impacts on treaty resources in deciding whether to approve a state's submission. *Id*.

EPA's action here is inconsistent with how it has exercised its oversight authority elsewhere. For example, in Maine, EPA exercised its oversight authority in reviewing stated adopted water quality standards to disapprove of certain criteria that did not

36

adequately protect tribal sustenance fishing.[14]  In 2016, in promulgating human health criteria for the State of Washington, EPA noted that most waters covered by the State's water quality standards were subject to Federal treaties that retained and reserved tribal fishing rights.  EPA concluded that these tribal fishing rights must be considered when establishing criteria to protect the State's fish harvesting designated use.  *See*, Revision of Certain Federal Water Quality Criteria Applicable to Washington, 81 Fed. Reg. 85417, 85422-3 (November 28, 2016).

In reviewing Minnesota's Revised Water Quality Standards, Minnesota and EPA failed to consider the cumulative effects of the relaxed standards on waters where tribal reserved rights are retained, despite the Bands and others reminding them of this obligation.  An obvious consideration is the existing impairments to aquatic life and wild rice around the state from the salty pollutants, all of which occurred under the stricter numeric standards.  Minnesota and EPA are required to consider how tribal resources such as aquatic life and wild rice will be affected in waters that flow and surround the Ceded Territories when weaker narrative standards are the only controls—yet both agencies disregarded this Clean Water Act responsibility.[15]

---

[14] Letter from H. Curtis Spalding, Regional Administrator, EPA Region 1, to Patricia W. Aho, Commissioner, Maine Department of Environmental Protection, ''Re: Review and Decision on Water Quality Standards Revisions" (February 2, 2015) (disapproving of certain human health criteria adopted by the State of Maine because they did not adequately protect a sustenance fishing designated use.).

[15] In *Miccosukee Tribe of Indians of Fla. v. United States*, No. 04-21448-CIV, 2008 WL 2967654, the court found that EPA "violated 40 C.F.R. § 131.10(b) by failing to consider the effects on the downstream water user, the Miccosukee Tribe, since a significant portion of the impacted areas lie directly above the Tribe's lands.  The record [did] not

E.    Narrative Translators Do Not Cure the Deficiencies in Minnesota's Revised Standards.

EPA cannot overcome the fatal deficiencies in its analysis of Minnesota's Revised Water Quality Standards by relying on the state's implementation of narrative translators. This is especially true where the narrative translators do nothing to assess and protect in-stream or downstream uses for aquatic life and aquatic plants like wild rice. MPCA's narrative translators simply take a snapshot at the "intake pipe" of an industrial or agricultural user to determine whether water is protective of a downstream appropriator for industrial or agricultural uses only at levels many times higher than is healthy for in-stream invertebrates or wild rice. MPCA's proposed industrial translator only considers water quality where it may be appropriated by an industrial user, which tells regulators nothing about the overall ambient health of the water necessary for aquatic life or aquatic plants like wild rice to thrive. *See* AR 1177, 1182, 1185, 1190.

As for the narrative translator for aquatic life, EPA made clear that Minnesota needed to be able to generate a numeric expression of its narrative criteria to protect aquatic life uses to determine whether limits or discharges of these pollutants and parameters are necessary to protect aquatic life. AR 5056-7. Minnesota's narrative translator for aquatic life does not address hardness, bicarbonates, boron, total dissolved solids, or sodium, all of which had numeric criteria that were generally applicable to all Minnesota surface waters before being eliminated. AR 1193. The narrative translator

---

even contain an overlay of the Tribe's lands in relation to the computer-generated estimate of impacted areas within WCA 3." at *38 n. 70 (S.D. Fla. July 29, 2008). The same result is warranted here.

also provides no means to calculate a numeric limit in a permit as it merely requires "the waterbody to be further investigated to determine if specific conductance values are problematic throughout the water body." *Id.*, AR 1199. If pollution crosses this threshold, "a plan needs to be developed for approaching permitting." *Id.*, AR 1200. While Minnesota has flexibility in developing water quality standards, neither the state nor EPA can rely on permit conditions that may occur later in the regulatory process to plug gaps in its water quality standards. *El Dorado Chemical Co. v. E.P.A.*, 763 F.3d 950, 959 (8th Cir. 2014) (rejecting an argument that future conditions would compensate for gaps in proposed water quality standards). Such reliance is especially misplaced here where EPA did not review the translator for aquatic life to ensure that it was protective. AR 3927-32. Minnesota and EPA's reliance on such future contingencies violates the Clean Water Act.

II.    EPA DISREGARDED EVIDENCE CONCERNING MINNESOTA'S MANAGEMENT OF ITS WATER QUALITY.

When EPA approved Minnesota's Revised Water Quality Standards for Industrial and Agricultural Uses, the agency acted arbitrarily because there needed to be consideration of the state's challenges in implementing its existing program. EPA must "examine all relevant factors and record evidence" and "adequately analyze . . . the consequences" of its actions. *Am. Wild Horse Pres. Campaign v. Perdue,* 873 F.3d 914, 923 (D.C. Cir. 2017); *see also Humane Soc'y of United States v. Zinke*, 865 F.3d 585, 606 (D.C. Cir. 2017). EPA attempted to support its approval with the assumption that Minnesota's implementation of narrative criteria would result in more stringent

39

limitations in NPDES permitting and other regulatory decisions. AR 3927-32. But EPA's optimistic outlook fails to consider the stark reality that Minnesota has struggled for years to implement and enforce its water quality standards—a fact that the state itself admitted. AR 984 ("MPCA recognizes that many older narrative standards are not regularly enforced, in that they are not generally incorporated into permit limits"). Narrative criteria are inherently vague, and Minnesota has documented difficulty in implementing its existing program, a fact which EPA did not address. *See, e.g.*, AR 8445, 11267, 11885, 12350, 12381, *In re. Reissuance of NPDES/SDS Permit to U.S. Steel Corp. for Minntac Facility*, 937 N.W.2d 770, 787-88 (Minn. App. 2019), *partially rev'd on other grounds*, 952 N.W.2d 572 (Minn. 2021)

EPA also failed to address the fact that Minnesota has only set effluent limits based on the 10 mg/L wild rice sulfate standard for one discharger—U.S. Keetac. AR 7697. Monitoring reports from Keetac show that sulfate discharge from the mine far exceeds the permit limits. AR 7828. MPCA finalized a permit for Polymet mine without including any effluent limits for sulfate or monitoring requirements for sulfate discharge to ensure that wild rice waters were protected. AR 7835. EPA has listed 32 waterbodies used in Minnesota for wild rice as impaired due to sulfate levels *even where the 10 mg/L sulfate standard has applied for decades*. EPA Impaired Waters Press Release, https://tinyurl.com/2fwvp6b5. Plainly, Minnesota's "trust the translator" assurances here ring hollow.

In approving Minnesota's Revised Water Quality Standards, EPA accepted Minnesota's statement that it "[did] not expect that the rule changes will result in

increases in the pollutants at issue (those that currently have numeric Class 3 [industrial] and 4 [agricultural] standards, because of the detailed implementation procedures." AR 851, *see also* AR 1618. Minnesota also stated, "we do not expect permitted dischargers to increase their discharge of ionic (that is, salty) pollutants." *Id*. There is nothing in the record to support these assumptions; in fact, Minnesota contradicts itself in the very same document by admitting that:

- "…these changes will likely result in fewer and less restrictive limits in permits." AR 909

- "In most cases, the proposed revisions will allow for lesser treatment, possibly reducing the impact of the Class 3 [industrial] and 4 [agricultural] standards." *Id*., AR 969.

- "…the overall effect of the rulemaking is to reduce the cumulative effect or burden of treating wastewater to reduce salts in the discharger." *Id*.

Because EPA approved Minnesota's Revised Standards without proper analyses and sound rationale, the agency acted arbitrarily, capriciously, contrary to the evidence in the record, and contrary to law.

## CONCLUSION

EPA acted contrary to the explicit direction of the Clean Water Act when it approved Minnesota's Revised Water Quality Standards and failed to ensure the State's water quality standards would protect designated uses of Minnesota's waters—both instream and downstream. EPA's approval of Minnesota's Revised Water Quality

Standards also fails to include a reasoned rationale for eliminating numeric criteria. For these reasons, the Bands respectfully request the Court reverse and vacate EPA's approval of Minnesota's Revised Standards.

Respectfully submitted this 10th day of May, 2023.

/s/ Ashley N. Bennett
ASHLEY N. BENNETT (WSB #53748)
(admitted pro hac vice)
JANETTE K. BRIMMER (MN #174762)
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA 98104-1711
(206) 504-3459
jbrimmer@earthjustice.org
abennett@earthjustice.org

SARA K. VAN NORMAN (MN #339568)
Van Norman Law, PLLC
400 South 4th Street, Ste. 401
Minneapolis, MN 55415
(612) 299-1794
sara@svn.legal

*Attorneys for Plaintiffs Grand Portage Band of Lake Superior Chippewa, and Fond du Lac Band of Lake Superior Chippewa*

SEAN COPELAND (MN #387142)
Tribal Attorney
Fond du Lac Band of Lake Superior Chippewa
1720 Big Lake Road
Cloquet, MN 55720
(218) 878-2632
seancopeland@fdlrez.com

*Attorney for Plaintiff Fond du Lac Band of Lake Superior Chippewa*

42