**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

GRAND PORTAGE BAND OF LAKE
SUPERIOR CHIPPEWA and FOND DU LAC
BAND OF LAKE SUPERIOR CHIPPEWA,

                                  Plaintiffs,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY and MICHAEL S.
REGAN, *Administrator of United States*
*Environmental Protection Agency*,

                                  Defendants,

v.

COALITION OF GREATER MINNESOTA
CITIES, RANGE ASSOCIATION OF
MUNICIPALITIES AND SCHOOLS,
MINNESOTA CHAMBER OF COMMERCE,
CLEVELAND-CLIFFS, INC., UNITED STATES
STEEL CORPORATION, and MINNESOTA
POLLUTION CONTROL AGENCY,

                         Intervenor-Defendants.

Civil No. 22-1783 (JRT/LIB)

**ORDER DENYING PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND
GRANTING DEFENDANTS' AND
INTERVENOR-DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT**

---

Ashley Bennett, **EARTHJUSTICE**, 4215 South Lucile Street, Seattle, WA 98118; Janette K. Brimmer, **EARTHJUSTICE**, 810 Third Avenue, Suite 610, Seattle, WA 98104; Sara Van Norman, **VAN NORMAN LAW, PLLC**, 400 East Fourth Street, Suite 401, Minneapolis, MN 55415, for Plaintiffs.

Sean W. Copeland, **FOND DU LAC LEGAL AFFAIRS**, 1720 Big Lake Road, Cloquet, MN 55720, for Plaintiff Fond du Lac Band of Lake Superior Chippewa.

Perry Rosen, **DEPARTMENT OF JUSTICE ENVIRONMENTAL AND NATURAL RESOURCES DIVISION**, 601 D Street Northwest, Room 2434, Washington, D.C. 20047, for Defendants.

Haley L. Waller Pitts and Nicole M. Moen, **FREDRIKSON & BYRON**, 60 South Sixth Street, Suite 1500, Minneapolis, MN 55402; Jeremy P. Greenhouse, **FREDRIKSON & BYRON, P.A.**, 200 South Sixth Street, Suite 4000, Minneapolis, MN 55402, for Intervenor-Defendants Coalition of Greater Minnesota Cities, Range Association of Municipalities and Schools, Minnesota Chamber of Commerce, Cleveland-Cliffs, Inc., and United States Steel Corporation.

Colin Patrick O'Donovan and Oliver J. Larson, **MINNESOTA ATTORNEY GENERAL'S OFFICE**, 445 Minnesota Street, Suite 900, St. Paul, MN 55101, for Intervenor-Defendant Minnesota Pollution Control Agency.

Arielle Wagner, David J. Zoll, and Laura Matson, **LOCKRIDGE GRINDAL NAUEN PLLP**, 100 Washington Avenue South, Suite 2200, Minneapolis, MN 55401, for Amici Curiae Bois Forte Band of Chippewa, Lower Sioux Indian Community, Leech Lake Band of Ojibwe, Mille Lacs Band of Ojibwe, Minnesota Chippewa Tribe, Prairie Island Indian Community, Red Lake Nation, Upper Sioux Community, and White Earth Nation.

Plaintiffs Grand Portage Band of Lake Superior Chippewa and Fond du Lac Band of Lake Superior Chippewa (the "Bands") bring this action against Defendants the Environmental Protection Agency and its director, Michael S. Regan (collectively "EPA"). The Bands claim that EPA's approval of Minnesota's (the "State") 2021 revised water quality standards was arbitrary, capricious, and contrary to the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.*, and implementing regulations, all in violation of the Administrative

Procedure Act ("APA"), 5 U.S.C. §§ 500 *et seq.* The Bands ask the Court to vacate EPA's approval of the revised standards.

This case primarily presents the question of what is required of EPA in approving revisions to state water quality standards to ensure that other downstream water uses and Tribes' treaty-reserved rights are protected. Until 2021, Minn. R. 7050.0223 and Minn. R. 7050.0224 provided statewide numeric limits of pollutants allowed in Minnesota waters used for industrial consumption and irrigated agriculture. Those standards' numeric limits incidentally protected aquatic life and wild rice by limiting salty pollutants that threaten the health and survival of aquatic life and wild rice, which are of particular importance to the Bands.

The revisions replaced quantitative standards with qualitative narrative standards that describe the characteristics that Minnesota waters must have to protect industrial consumption or irrigated agriculture uses, and which are applied on a site-specific basis through State-issued water use permits. The Bands challenge EPA's approval of the revised standards, in part, because the agency failed to meaningfully consider the adverse impact that removing the numeric limits in the revised standards may have on other downstream water uses, particularly aquatic life and wild rice, as well as the Bands' treaty reserved rights to use Minnesota waters.

In approving the revised water quality standards, EPA determined that aquatic life and wild rice, as well as the Bands' treaty-reserved rights, would continue to be protected

by separate, unaffected water quality standards that are specifically crafted to protect aquatic life and wild rice in Minnesota waters.  In waters used for industrial consumption or irrigated agriculture as well as for aquatic life or wild rice, the agency concluded that the revised standards and separate, unaffected standards would apply together to protect the most sensitive use, ensuring that all designated uses are protected.

Because EPA has supplied a rational basis for its determination that the revised water quality standards will protect their designated uses, are scientifically sound, and that the most sensitive uses will be protected in waters with multiple uses, the Court finds that EPA's approval was not arbitrary, capricious, or contrary to the Clean Water Act. Accordingly, the Court will deny the Bands' motion for summary judgment and grant EPA's and Intervenor-Defendants' motions for summary judgment.

**BACKGROUND**

## I.      STATUTORY AND REGULATORY FRAMEWORK

Congress enacted the Clean Water Act (or "the Act") to restore and maintain the chemical, physical, and biological integrity of waters in the United States.  33 U.S.C. § 1251(a).  The states, federal government, and Tribes partner to carry out the Act's objectives.  *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992); 33 U.S.C. § 1377(e); 40 C.F.R. § 131.8.  The Act establishes two sets of water quality measures: (1) effluent limitations, which are promulgated by EPA and restrict the quantity of pollutants discharged from identifiable sources of pollution; and (2) water quality standards, which are generally

promulgated by the states and establish the desired conditions of a waterbody. *Arkansas*, 503 U.S. at 101; 33 U.S.C. §§ 1311, 1313, 1314.

States must establish water quality standards that specify "designated uses," which are uses of water that require protection under the standards, and water quality "criteria," which set pollutant limits or the minimum conditions necessary to protect the designated uses. 33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. §§ 131.3(f), 131.11(a)(1). Water quality criteria can be numeric, meaning they provide quantitative, measurable limits of pollutants allowed in a waterbody, or narrative, meaning they provide qualitative descriptions of the characteristics of a waterbody that are necessary to protect the designated uses. *See* 40 C.F.R. § 131.3(b). Numeric criteria are generally favored, and implementing regulations instruct states to adopt narrative criteria where numeric criteria cannot be established or to supplement numeric criteria. *Id.* § 131.11(b)(2).

One of the primary methods of implementing water quality standards is through National Pollutant Discharge Elimination System ("NPDES") permits, which states issue to dischargers of pollutants. *Arkansas*, 503 U.S. at 101–02. EPA has delegated authority to issue Minnesota NPDES permits to MPCA. *See In re Alexandria Lake Area Sanitary Dist. NPDES/SDS Permit No. MN0040738*, 763 N.W.2d 303, 309 (Minn. 2009) (citing Minn. Stat. § 115.03, subd. 5; 40 C.F.R. § 123.25(a)). Polluters are prohibited from discharging effluents into a waterbody unless they have an NPDES permit. *Id.* at 309; *see also* 33 U.S.C. § 1311(a). NPDES permits provide conditions that will result in compliance with

state water quality standards.  33 U.S.C. § 1342(a)(1); 40 C.F.R. § 122.44(d)(1).  Narrative criteria are generally more difficult to implement in a permit than numeric criteria.  *In re Alexandria*, 763 N.W.2d at 309 (citing *Am. Paper Inst., Inc. v. United States Env't Prot. Agency*, 996 F.2d 346, 350 (D.C. Cir. 1993)).

EPA must approve a state's water quality standards before they become effective and must make certain determinations in the review process.  33 U.S.C. § 1313(c)(2)(A), (c)(3); 40 C.F.R. § 131.5.  These determinations include:  (1) whether the state has adopted designated uses that are consistent with the Clean Water Act; (2) whether the state has adopted criteria that protect the designated use; (3) whether the state followed applicable procedures for revising or adopting standards; (4) whether the standards are based on appropriate technical and scientific data; and (5) whether the standards meet the submission requirements provided in 40 C.F.R. § 131.6.  40 C.F.R. § 131.5(a).  Water quality standards must protect the designated use for which they are crafted, be based on sound scientific rationale, ensure the attainment and maintenance of downstream water quality standards, and protect the most sensitive use in waters with multiple designated uses.  40 C.F.R. §§ 131.10(b), 131.11(a).

## II.    FACTUAL BACKGROUND

### A.    Minnesota's 2021 Water Quality Standards Revisions

Minnesota's water quality standards establish seven types of designated uses, including aquatic life and recreation (Class 2), industrial consumption (Class 3), and

agriculture and wildlife (Class 4).  Minn R. 7050.0140.  Each classification establishes its own set of water quality criteria necessary to protect the applicable designated use(s).

The previous industrial, agricultural and wildlife use classes and their associated standards were established in the late 1960s.  AR 811–12.[1]  There have been some revisions over the years, but for the most part the numeric standards have remained the same since the rules were established in the 1960s.  AR 812.  In 2021, after a decade-long process, MPCA amended Minnesota's water quality standards to revise the State's designated uses and water quality criteria at Minn R. 7050.0223 to protect industrial consumption uses (Class 3) and the State's criteria at Minn. R. 7050.0224 to protect agriculture and wildlife uses (Class 4).  AR 802, 3903.

### 1. Industrial Consumption Use

Prior to the 2021 revisions, Minnesota divided Class 3 into four industrial subclasses with distinct numeric and narrative criteria based on the necessary level of treatment before the water is used for industrial purposes.  AR 811–13.  When reviewing the Class 3 standards, MPCA determined that industrial water appropriators are primarily concerned about consistency and quantity of water intake and are willing to treat water to achieve their specific water quality needs.  AR 1024–25.  Because technologies had significantly improved for industrial appropriators to treat their intake water, MPCA concluded that the previous numeric criteria that protected industrial consumption use

---

[1] All citations to the Administrative Record are from ECF No. 22-1783.

were no longer necessary and thus lacked a sound scientific rationale. AR 811–813, 1039–40. After considering survey data and the limited research that exists on industrial water treatment needs, MPCA also determined it was impossible to establish new single, statewide numeric values for chlorides, hardness, and pH that would protect all waters used for industrial consumption purposes because of the varied water treatment needs between industrial appropriators. AR 1038–39.

Thereafter, MPCA re-designated the Class 3 sub-classes as a single Class 3 use classification and replaced all numeric criteria with a single narrative standard. AR 814. The narrative standard incorporates language from the pre-2021 descriptions of the overall class and subclasses and requires that Class 3 waters be of such quality as to permit their use for industrial purposes to avoid severe fouling, corrosion, or scaling. Minn. R. 7050.0223 Subp. 2. MPCA also adopted a "narrative translator," which translates the narrative standards into effluent limitations for permitting depending on the unique needs of the water operation at issue. AR 1040–41, 8715–22. Narrative translators assist the State in ensuring that narrative criteria are attained by converting the protective goals of narrative standards into enforceable, numeric wastewater effluent limitations that protect the designated use(s). AR 1175. The Class 3 translator helps determine whether a discharger must have an effluent limit to protect a downstream industrial use. *See* Minn. R. 7053.0260. MPCA also changed its enforcement of industrial water quality

standards to assess compliance at the point that an industrial user withdraws water instead of at the discharge point.  Minn R. 7053.0205 Subp. 7(E); 7053.0260 Subp. 3(B).

### 2.  Agriculture and Wildlife Use

The agriculture and wildlife use classification is divided into multiple subclasses, including irrigated agriculture (Class 4A) and livestock and wildlife (Class 4B).  Minn. R. 7050.0224.  The Bands' challenge only relates to the Class 4A revisions.  The Class 4A irrigated agriculture subclass establishes criteria that are generally applicable to all waters used to irrigate crops and vegetation, as well as criteria that are specifically applicable to waters used for wild rice production.  Minn R. 7050.0224 Subp. 2.

### a.  General Criteria

Prior to the 2021 revisions, the general water quality criteria for Class 4A included numeric and narrative criteria.  AR 1054.  The numeric criteria established limits for bicarbonates, pH, specific conductance, total dissolved salts, and sodium (collectively "salt pollutants"), as well as sulfates and boron.  AR 813, 1054.  Upon review of the Class 4A standards, MPCA determined that the prior numeric criteria for the salt pollutants were no longer scientifically defensible.  AR 1058–62.  The wide variety of irrigated agriculture water needs, which vary based on crop type, soil type, soil drainage management techniques, precipitation patterns, irrigation practices, and soil mineral content, precluded the adoption of single, statewide numeric criteria for the salt pollutants that would protect irrigated agriculture use.  *Id.*  MPCA thus concluded that the

best way to protect irrigated agriculture use was through a narrative standard and robust implementation process. *Id.*; AR 802.

As a result, MPCA removed the numeric criteria for the salt pollutants and retained the previous narrative criteria, with some minor revisions. AR 3911–12; Minn. R. 7050.0224 Subp. 2. The narrative standard now requires that Class 4A waters be of such quality "as to permit their use for irrigation without significant damage or adverse effects upon any crops or vegetation usually grown in the waters or area." Minn. R. 7050.0-224 Subp. 2. MPCA left in place the numeric criteria for boron, radioactive materials, and sulfates. MPCA also adopted a narrative translator to establish numeric thresholds for the salt pollutants. AR 1121–32, 8723–31. The Class 4A translator sets numeric thresholds for sodium absorption ratio and specific conductance for sensitive and non-sensitive crops to ensure that waters used for irrigation will not detrimentally increase soil salinity in the root zone. AR 8730, 1128–29; *see also* Minn. R. 7053.0263. MPCA also changed its enforcement of irrigation water quality standards to assess compliance at the point at which water is withdrawn for irrigation. Minn. R. 7053.0205 Subp. 7(D); *id.* 7053.0263 Subp. 3(B).

### b. Specific Criteria for Wild Rice

Minnesota has numeric and narrative criteria that specifically protect wild rice, which it did not revise in the 2021 revision package. *See* Minn. R. 7050.0224 Subp. 2. The numeric criteria limits sulfate to 10 mg/L in waters used for production of wild rice during

periods when the rice may be susceptible to damage by high sulfate levels. *Id.* The narrative criteria requires that the quality of the waters and aquatic habitat for wild rice not be materially impaired or degraded. *Id.* 7050.0224 Subp. 1.

### 3. Aquatic Life and Recreation Use

Minnesota also has numeric and narrative criteria that protect aquatic life, which it did not revise in 2021. Minn. R. 7050.0140 Subp. 3, 7050.0222. Aquatic life use refers to waters that support or may support aquatic biota. Minn. R. 7050.0140 Subp. 3, 7050.0222. The Class 2 standards establish numeric criteria for over 70 substances, including salt pollutants like chloride, which is limited to 230 mg/L in Class 2 waters. Minn. R. 7050.0222. Class 2 also establishes narrative criteria and biological criteria, which use field surveys to assess the condition of biological communities in a waterbody to protect aquatic life. Minn. R. 7050.0222 Subps. 2, 3, 7(A), 2d, 3d, 4d.

The industrial discharge of salty pollutants can threaten the health and survival of aquatic life. *See, e.g.*, AR 2103, 6025–37, 6074–6133. In promulgating the revised water quality standards at issue in this case, MPCA recognized such concerns. AR 806–07, 851. However, MPCA anticipated that the revisions would not result in harmful increases in salt pollutants because of the detailed implementation procedures to attain the revised Class 3 and 4 narrative standards, as well as the Class 2 chloride standard that remains unaffected by the 2021 rulemaking. AR 851. Additionally, MPCA shared steps that it is taking to protect Class 2 aquatic life uses while research is underway to determine an appropriate numeric standard for future Class 2 rulemaking. AR 1193. The interim

approach is grounded in the Class 2 narrative criteria and will apply a translator to "translate" the narrative criteria into more workable, numeric values for permits, specifically for chloride and sulfate. *See* AR 1193–1207.

## B. EPA's Approval of Minnesota's 2021 Revisions

In August 2021, MPCA submitted its rule revision package to EPA. AR 3903, 3499. The rule revision package contained MPCA's technical analysis, scientific studies and surveys it considered, the public comments it received, and MPCA's response to public comments. AR 1–3901.

In reviewing the package, EPA invited representatives of the eleven Tribes in Minnesota to participate in two conference calls to consult on the revisions. AR 3946, 8820. Five Tribes participated on either one or both calls, and one Tribe also submitted written comments. AR 3946. EPA summarized the issues identified by the Tribes during the consultation and discussed how EPA considered those concerns in its review of the revisions. AR 8820–32.

On October 8, 2021, EPA approved MPCA's revisions to its water quality standards. AR 3947–48. EPA explained its decision in a 44-page approval letter that cites scientific studies the agency considered and public comments it received. *See generally* AR 3903– 46, 3949–8774, 8983–10078. EPA acknowledged concerns that removing industrial and agricultural numeric criteria that incidentally protected aquatic life and wild rice would negatively impact aquatic life, wild rice, and human health. *See* AR 3925–32. It nonetheless concluded that existing water quality standards for aquatic life and wild rice,

which were unaffected by the rulemaking at issue in this case, would continue to protect

those designated uses, especially when they are the more sensitive use.

Starting with aquatic life, EPA considered whether it was scientifically possible for

MPCA to derive numeric criteria to protect aquatic life from the effects of the salty

pollutants beyond the 230 mg/L numeric limit for chloride that MPCA has already

adopted.  AR 3927; *see also* Minn. R. 7050.0222.  But because "ion toxicity is complex and

dependent on multiple factors," deriving numeric criteria to protect aquatic life "is a

matter of evolving science," not yet susceptible to quantitative resolution.  AR 3927.

Furthermore, the agency noted that given the variability of water quality needs for

industrial consumption and irrigated agriculture uses, it is "not possible" to determine

whether aquatic life is the most sensitive use with respect to salty pollutants in waters

also used for industrial consumption and/or irrigated agriculture uses.  AR 3928.  The

agency determined that the State's existing narrative and biological criteria for aquatic

life had been "duly adopted, approved by EPA and effective for all [Clean Water Act]

purposes" and were therefore independently adequate, irrespective of the revised

standards, to protect aquatic life when it is the more sensitive use.  AR 3928.

EPA also considered MPCA's proposed methods of implementing the existing Class

2 narrative and biological criteria to combat the salty pollutants, methods which were

developed from an EPA manual.  *Id.*; *see also* AR 1193–1287.  Though EPA did not

specifically review these methods to determine whether they protect aquatic life, it did

note that MPCA's proposed implementation methods "are based on accepted methods for identifying effects to aquatic life." AR 3929 n.27. Ultimately, EPA concluded that "in the absence of the numeric criteria for ions associated with Class 3 and 4 that Minnesota is removing, Minnesota's existing narratives protect against the types of harm excess ions may present to aquatic life in waterbodies designated for aquatic life." AR 3929.

Turning to wild rice, EPA acknowledged the commenters' primary concern about increased sulfate levels, which is especially harmful to wild rice. But the wild rice numeric limit for sulfate, 10 mg/L, would be unaffected by the rulemaking because it remains in effect for "water used for production of wild rice." AR 3930. EPA then considered whether it was possible for MPCA to derive numeric criteria to protect aquatic plants from the effects of the other salt pollutants. Similar to aquatic life, EPA determined that such criteria are a "matter of evolving science" requiring "additional data and analysis regarding wetland plant responses," especially in the absence of EPA recommendations. *Id*. And as with aquatic life, it is "not possible" to determine whether wild rice is the most sensitive use with respect to the salty pollutants in waters also used for variable industrial consumption and/or irrigated agriculture uses. *Id.*

At any rate, the agency determined that the State's existing narrative criteria for irrigated agriculture protects wild rice where it is cultivated, and that the specific narrative criteria for aquatic life, including wild rice, are also adequately protective of wild rice. AR 3931. EPA also noted MPCA's proposed implementation methods for these criteria. *Id.*

EPA ultimately concluded that the existing water quality standards protect against the salty pollutants that may harm wild rice.  *Id.*

Furthermore, for both aquatic life and wild rice EPA noted that the revised industrial and agricultural water quality standards were never intended to protect aquatic life or wild rice.  Consequently, "there was not then and there is not now a sound scientific rationale to support a conclusion that the criteria that Minnesota has removed would be protective of aquatic life [or wild rice] uses."  AR 3929, 3932.  Additionally, EPA noted its anticipation that "greater reliance on implementation of Minnesota's approved narrative criteria will result in its NPDES permitting and other regulatory decisions including limitations more stringent than ones based on the now-removed criteria, to the extent that best available current or evolving science indicates that such more stringent limits would protect" aquatic life and wild rice.  AR 3929, 3932.

### C.  The Bands' Treaty Reserved Rights

The Bands are sovereign, federally recognized Indian Tribes with reservations in northern Minnesota.  (Compl. ¶ 9, July 14, 2022, Docket No. 1.)  Fish and wild rice in Minnesota waters hold great cultural, economic, subsistence, ecological, medicinal, and spiritual significance to the Bands.  (Decl. of Thomas Ethan Howe ¶¶ 9, 18–21, May 10, 2023, Docket No. 91; Decl. of April M. McCormick ¶¶ 6–10, May 10, 2023, Docket No. 92.)  The Bands have rights to harvest wild rice and other resources that are protected under treaties and federal law.  Specifically, the 1854 Treaty of LaPointe and 1837 Treaty with

the Chippewa establish the Bands' usufructuary rights across off-reservation lands and waters.  10 Stat. 1109 (Sept. 30, 1854); 7 Stat. 536 (July 20, 1837).

EPA authorizes the Bands to administer water quality standards in the same way as states.  33 U.S.C. § 1377(e).[2]  The Bands have adopted their own water quality standards to combat pollution and preserve waters that flow through their reservations, which include criteria to protect aquatic life and wild rice.[3]

### III.   PROCEDURAL HISTORY

The Bands initiated this action against EPA.  (*See* Compl.)  Intervenor-Defendants Minnesota Pollution Control Agency ("MPCA") and Coalition of Greater Minnesota Cities, Range Association of Municipalities and Schools, the Minnesota Chamber of Commerce, Cleveland-Cliffs Inc., and United States Steel Corporation (collectively "Regulated Entities") moved to intervene as defendants, which the Court granted.  (Order at 18, Nov. 21, 2022, Docket No. 57.)  The Bands and EPA filed cross motions for summary judgement on all causes of action.  (Pls.' Mot. Summ. J., May 10, 2023, Docket No. 88; Defs.' Cross Mot. Summ. J., June 21, 2023, Docket No. 99.)  The nine other federally recognized Tribes in Minnesota moved for leave to file an amici curiae brief in support of the Bands'

---

[2]  U.S.  E.P.A.,  *Tribes  Approved  for  Treatment  as  a  State  (TAS)*, https://www.epa.gov/tribal/tribes-approved-treatment-state-tas (last visited Mar. 13, 2024).

[3]  *See* U.S. E.P.A., Tribal Water Quality Standards, Grand Portage Band of Minnesota Chippewa, https://www.epa.gov/wqs-tech/water-quality-standards-regulations-grand-portage-band-minnesota-chippewa (last visited Feb. 29, 2024); EPA, Tribal Water Quality Standards, Fond du Lac Band of the Minnesota Chippewa, https://www.epa.gov/wqs-tech/water-quality-standards-regulations-fond-du-lac-band-minnesota-chippewa (last visited Feb. 29, 2024).

summary judgment motion, which the Court granted.[4]  (Mot. to Appear as Amici Curiae, June 2, 2023, Docket No. 95; Order, June 7, 2023, Docket No. 97.)  The MPCA and Regulated Entities filed separate motions for summary judgment.  (Cross Mot. Summ. J., June 30, 2023, Docket No. 103; Cross Mot. Summ. J., July 2, 2023, Docket No. 107.)

## DISCUSSION

### I.   STANDARD OF REVIEW

#### A.  Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material fact, and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The nonmoving party may not rest on mere allegations or

---

[4] The Court appreciates hearing from the Bois Forte Band of Chippewa, Lower Sioux Indian Community, Leech Lake Band of Ojibwe, Mille Lacs Band of Ojibwe, Minnesota Chippewa Tribe, Prairie Island Indian Community, Red Lake Nation, Upper Sioux Community, and White Earth Nation.  The amici curiae brief provided helpful context and arguments for the Court's consideration.  Because of the overlap of the amici curiae arguments with the Bands', the Court will address all arguments together.

denials but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial. *Anderson*, 477 U.S. at 256 (discussing Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

When a court reviews agency action under the APA, the entire case on review is a question of law. *Am. Bioscience, Inc. v. Thompson et al.*, 269 F.3d 1077, 1083 (D.C. Cir. 2001); *Mahnomen Cnty. v. Bureau of Indian Affs.*, 604 F. Supp. 2d 1252, 1255–56 (D. Minn. 2009). The question is whether, based on the administrative record, the agency's action was lawful. *See Mahnomen Cnty.*, 604 F. Supp. 2d at 1256. Thus, resolution at the summary judgment stage is likely. Here, the parties agree there are no genuine issues of material fact and that the only question is a legal one: whether EPA's approval of Minnesota's revised water quality standards violated the Clean Water Act and the APA.

### B. Administrative Procedure Act

The Court's review of agency decisions is limited by the APA. *Voyageurs Nat'l Park Ass'n v. Norton*, 381 F.3d 759, 763 (8th Cir. 2004). The APA allows a court to set aside an agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *Gipson v. I.N.S.*, 284 F.3d 913, 916 (8th Cir. 2002) (quoting *id.*). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An

agency decision is not arbitrary and capricious if it "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts and the choice made." *Simmons v. Smith*, 888 F.3d 994, 998 (8th Cir. 2018) (quoting *State Farm*, 463 U.S. at 43). A court will affirm the agency's findings of fact if it "is supportable on any rational basis." *Foster v. Vilsack*, 820 F.3d 330, 333 (8th Cir. 2016) (citing *Voyageurs*, 381 F.3d at 763).

The Bands bear the burden of demonstrating that EPA's action was arbitrary and capricious. *United States v. Massey*, 380 F.3d 437, 440 (8th Cir. 2004). If the Court finds the Bands have not met their burden, it will validate EPA's approval and grant EPA's and the Intervenor-Defendants' motions for summary judgment on that basis.

## II.    THE BANDS' STANDING

As an initial matter, the Regulated Entities assert that the Bands lack standing to challenge the revised Class 3 standards.[5] Because the purpose of the revised Class 3 standards is to protect industrial consumption use and because the Bands have not alleged an injury to industrial use, the Regulated Entities claim the Bands have failed to allege an injury within their protected zone of interests. The Court disagrees.

Prudential standing requirements limit the exercise of federal jurisdiction, in part, by requiring that "a plaintiff seeking judicial review must also show the injury complained

---

[5] The Regulated Entities and other defendants do not contest the Bands' standing to challenge the revised Class 4 standards.

of falls within the zone of interests sought to be protected by the statutory provision."
*Rosebud Sioux Tribe v. McDivitt*, 286 F.3d 1031, 1036 (8th Cir. 2002).  Because the Bands
are not themselves the subject of EPA's regulatory action, they lack standing only if their
interests "are so marginally related to or inconsistent with the purposes implicit in the
statute that it cannot reasonably be assumed that Congress intended to permit the suit."
*Id.* (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987)).  "Whether a plaintiff's
interest is arguably protected by the statute within the meaning of the zone-of-interests
test is to be determined not by reference to the overall purpose of the Act in question but
by reference to the particular provision of law upon which the plaintiff relies." *Id.* (cleaned
up).

Here, the Bands assert standing as sovereign, federally recognized Indian Tribes
with reservations in northern Minnesota and treaty-reserved usufructuary rights to
Minnesota waters.  The Bands claim their "existential interest in protecting Minnesota
waters and their treaty-reserved rights to hunt, fish, harvest wild rice, and gather food
and plants" fall within the zone of interests protected by the Clean Water Act.  (Pl.'s Mem.
Supp. Mot. Summ. J. at 27, May 10, 2023, Docket No. 90.)

The plain language of the Clean Water Act's provisions reflects a commitment to
ensure that states establishing water quality standards holistically evaluate such
standards' impact and ensure they preserve existing uses.  *See* 33 U.S.C. § 1313(c)(2)(A)
("Whenever the State revises or adopts a new standard, . . . [s]uch standards shall be

established taking into consideration their use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes."). The Act's regulations reflect the same commitment. *See* 40 C.F.R. § 131.10(b) (providing that states "shall take into consideration the water quality standards of downstream waters and shall ensure that its water quality standards provide for the attainment and maintenance of the water quality standards of downstream waters").

The Bands' treaty-reserved rights and existential interest in protecting Minnesota waters are not "so marginally related to or totally inconsistent with the purposes implicit" in the Clean Water Act to fall outside the protected zone of interests. *Rosebud*, 286 F.3d at 1036 (quoting *Clarke*, 479 U.S. at 399). Revisions to the Class 3 standards will allegedly harm the Bands' ability to exercise their treaty-reserved rights. Accordingly, the Court finds that the Bands have standing to challenge the Class 3 standards.

## III.   RECORD ON REVIEW

The Bands request that the Court judicially notice several documents that fall outside the administrative record because those documents contain information made publicly available by government entities. (*See* Aff. of Ashley Bennett ¶¶ 3–9, Exs. A–F, Aug. 2, 2023, Docket No. 114.) The Court cannot do so.

Under Rule 201 of the Federal Rules of Evidence, a court may take judicial notice of facts that are not reasonably disputed if certain criteria are met. Fed. R. Evid. 201(b). However, judicial review under the APA is generally limited to the administrative record that was before the agency when it made its decision. *Voyageurs*, 381 F.3d at 766; *Dist.*

*Hosp. Partners, L.P. v. Sebelius*, 971 F. Supp. 2d 15, 32 n.14 (D.D.C. 2013) ("[T]aking judicial notice is typically an inadequate mechanism for a court to consider extra-record evidence when reviewing an agency action."). The administrative record, and "not some new record made initially in the reviewing court," should be the "focal point" for judicial review. *Camp v. Pitts*, 411 U.S. 138, 142 (1973). While there are certain exceptions to this rule, they "apply only under extraordinary circumstances." *Voyageurs*, 381 F.3d at 766. "When there is 'a contemporaneous administrative record and no need for additional explanation of the agency decision, there must be a strong showing of bad faith or improper behavior before the reviewing court may permit discovery and evidentiary supplementation of the administrative record.'" *Id.* (quoting *Newton Cnty. Wildlife Ass'n v. Rogers*, 141 F.3d 803, 807–08 (8th Cir. 1998)).

Here, the Bands assert that the extra-record documents are necessary to determine "whether the agency has considered all relevant factors and has explained its decision." *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005). However, the Bands have not established a "strong showing of bad faith or improper behavior" that would justify taking judicial notice of these extra-record documents. *Voyageurs*, 381 F.3d at 766. The Court can, of course, consider documents that were referenced in the rulemaking comments and necessarily encompassed in the record. *See, e.g.*, AR 44 n.3, 177, 1903, 14268, 15535–36, 15810. But the Court will not go beyond those materials in the record.

IV.     **ARBITRARY AND CAPRICIOUS REVIEW**

The Bands assert that EPA's approval of Minnesota's 2021 revised water quality standards must be set aside for four reasons: (1) it was improper to remove the numeric criteria; (2) EPA failed to properly consider the impact of the revised standards on other downstream water uses, including aquatic life and wild rice; (3) EPA failed to meaningfully consider the impact the revised standards may have on the Bands' treaty-reserved rights to use Minnesota waters; and (4) there was no analysis of the cumulative impact of the revised standards given Minnesota's implementation and enforcement of water quality standards over the years.  The Court will analyze each argument in turn.

A.     **Numeric Criteria**

The Bands assert that it was improper for EPA to approve MPCA's decision to remove the numeric criteria from the revised water quality standards because numeric criteria could have been established.  The Court disagrees.

Under the Clean Water Act and implementing regulations states should adopt narrative criteria "where numerical criteria cannot be established or to supplement numerical criteria."  40 C.F.R. § 131.11(b).  Because numeric criteria were in place prior to the 2021 revisions, the Bands assert that numeric criteria were possible for the revised standards.[6]  But just because numeric criteria are possible does not mean they comply

---

[6] Amici argue that MPCA failed to perform a required Use Attainability Analysis ("UAA") to determine whether numeric criteria for Class 3 and 4 waters could be achieved.  *See* 40 C.F.R.

with the Clean Water Act and implementing regulations.  Water quality criteria "must be based on sound scientific rationale."  *Id.* § 131.11(a)(1).

MPCA determined based on technical literature and industry surveys that statewide numeric criteria for chlorides, hardness, and pH to protect industrial consumption uses were no longer necessary given the variability of water treatment needs across industrial appropriators.  MPCA also concluded that numeric criteria for salt pollutants to protect irrigated agriculture uses were no longer scientifically defensible given the wide variety of irrigated agriculture water needs that depend on a litany of factors.

It was reasonable for EPA to affirm MPCA's conclusion that the previous numeric criteria for industrial consumption and irrigated agriculture uses were "based on outdated assumptions" and were precluded by the variability of local irrigated agriculture factors throughout the State.  AR 1040.  National and international experts, scientific literature databases, specialized reports, and water quality standards in other states all indicated

---

§ 131.10(g).  EPA's website indicates that a UAA "must be conducted for any water body when a state or authorized tribe … designat[es] sub-categories of [uses specified in Section 101(a)(2) of the Clean Water Act] that require less stringent criteria than previously applicable."  U.S. E.P.A., Use Attainability Analysis (UAA), https://www.epa.gov/wqs-tech/use-attainability-analysis-uaa (last visited Mar. 13, 2024).  However, EPA determined that the only designated uses affected by the rulemaking are the "previously existing Class 3 industrial consumption subclasses," which the state re-designated with a general Class 3 use classification.  AR 8822.  The agency explained that the Class 3 industrial consumption uses are not uses specified in Section 101(a)(2) of the Act, which pertain to aquatic life and recreation, such that MPCA was not required to conduct a UAA to support the re-designation of waters with a general Class 3 use.  *Id.*

that statewide numeric criteria are disfavored given the varying needs of industrial and agricultural uses.  AR 3920–25.  While numeric criteria are generally preferred, a state is not required to establish statewide numeric criteria when they would not be scientifically sound, as EPA concluded here.

Furthermore, EPA did not improperly consider convenience and costs in deciding whether to remove the numeric criteria previously in place to protect industrial consumption and irrigated agriculture uses.  Convenience and costs associated with water quality compliance should not guide EPA's regulatory decision-making.  *See* 40 C.F.R. §§ 131.5, 131.11; *Miss. Comm'n on Nat. Res. v. Costle*, 625 F.2d 1269, 1277 (5th Cir. 1980) (agreeing with EPA's interpretation that economic factors are to be considered in designating uses but are irrelevant to the scientific and technical factors to be considered in setting criteria to meet those uses).  But they are relevant for the MPCA's analysis.  *See* Minn. Stat. § 14.131.  Concerns about convenience and costs created the urgency that prompted Minnesota to revise the water quality standards for those designated uses in the first place.  *See* AR 920.  And the fact that the costs of compliance are lower now under the revised standards is not per se impermissible.

The Court finds EPA's approval of replacing the numeric criteria rational and supported by science, and thus will not overturn EPA's decision on this basis.

### B.   Consideration of Aquatic Life and Wild Rice

The Bands claim that EPA failed to meaningfully consider the impact that removing the numeric criteria would have on other downstream water quality standards, including

those that protect aquatic life and wild rice.   The Bands claim that EPA rested on conclusory assumptions that other existing water quality standards will protect downstream water uses without conducting thorough analyses to support those assumptions.   *See Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018) ("Conclusory explanations for matters involving a central factual dispute where there is considerable evidence in conflict do not suffice to meet the deferential standards of our review." (quotation omitted)).   But while EPA could have done more to meaningfully consider such impact, it did enough to preclude judicial intervention.

The Clean Water Act "endorses a holistic approach to the nation's waterways."   *El Dorado Chem. Co. v. United States Env't Prot. Agency*, 763 F.3d 950, 959 (8th Cir. 2014); *see also* AR 3925–26 ("EPA interprets and implements its regulation at 40 C.F.R. § 131.11(a) to consider whether 'criteria' are holistically protective.").   Under this holistic approach, a state "shall take into consideration the water quality standards of downstream waters and shall ensure that its water quality standards provide for the attainment and maintenance of the water quality standards of downstream waters."   40 C.F.R. § 131.10(b).   In addition, water quality standards must protect the most sensitive use in waters with multiple designated uses.   40 C.F.R. § 131.11(a).

Here, EPA acknowledged that removing numeric criteria for industrial and agriculture uses may impact aquatic life, wild rice, and human health because the numeric criteria incidentally protected those uses.   Loss of those incidental benefits is legally

permissible, though.  *See Nat. Res. Def. Council, Inc. v. United States Env't Prot. Agency*, 16 F.3d 1395, 1404–05 (4th Cir. 1993).  And EPA explained that existing water quality standards for aquatic life and wild rice, which were unaffected by the rulemaking at issue in this case, remain in effect and will continue to protect those designated uses, especially when they are the more sensitive use.  Thus, the agency addressed the Bands' concerns, albeit briefly.  *Contra Genuine Parts Co.*, 890 F.3d at 314 (finding it arbitrary and capricious where agency "simply ignore[d]" cross sections of a study that did not support its position in the record).

The Court cannot find EPA's review of the standards' impact on aquatic life and wild rice arbitrary and capricious.  EPA made all the appropriate determinations as required under the Clean Water Act and implementing regulations.  *See* 40 C.F.R. § 131.5. And the agency's explanation that aquatic life and wild rice remain protected by their own numeric, narrative, and biological criteria is rational.  In waters where aquatic life or wild rice are the most sensitive uses, their corresponding standards are supposed to protect those uses, even if the revised Class 3 and 4 standards no longer do so.[7]  40 C.F.R. § 131.11(a).

_____

[7] Though the Bands insist that EPA should have analyzed what the most sensitive use is within the waters and how that use will be protected under the revised standards, the agency concluded that the variability of water quality needs for industrial consumption and irrigated agriculture uses make it impossible to determine whether aquatic life, wild rice, industrial consumption, or irrigated agriculture uses is the most sensitive use.  The Court is in no position to question this technical conclusion.

The Bands assert that EPA was required to conduct more comprehensive analyses, including how the revised standards could lead to increases in specific conductivity, sulfate, chloride, or mercury levels in Minnesota waters and in turn harm aquatic life or wild rice.  For example, the Bands claim EPA should have considered how the revised standards will presumptively allow a site-specific concentration of 1,000 mg/L of sulfate in any waterbody not used for cattle, which the Bands claim is 100 times the level of sulfate that protects wild rice.  In addition, the Bands assert that aquatic life will not be adequately protected by the 230 mg/L chloride standard that is set in the Class 2 criteria after removing the 50 mg/L and 100 mg/L chloride standards that were set in the Class 3 criteria given current data indicating the sensitivity of aquatic life to chloride at much lower levels.  While the Court agrees those analyses would have been helpful, they are not required by law.

The revised standards may have provided "backstop" numeric criteria protections for aquatic life and wild rice.  But those standards were meant to protect industrial consumption and irrigated agriculture uses, not aquatic life or wild rice.  And the regulations do not require that water quality standards specifically crafted to protect industrial and agriculture uses protect other uses in perpetuity just because they did so at one point.  Otherwise, there would be no need for multiple classifications of designated uses and their associated standards in the first place.  Instead, the State need only ensure that "its water quality standards provide for the attainment and maintenance of the water

quality standards of downstream waters."  40 C.F.R. § 131.10(b).  It was not arbitrary and capricious for the EPA to find that the revised standards did so here.

On this record and based on current science, EPA reasonably determined that the unaffected water quality standards already in place[8] to protect aquatic life and wild rice remain in effect to protect those uses.  While the agency's "just trust us" statements would never survive de novo review by the Court, the Court is bound by the extremely deferential standard of review under the APA.  The revisions to the water quality standards involve the evaluation of technical science of which MPCA and EPA are experts, and the Court may not "substitute its judgment for that of the agency."  *State Farm*, 463 U.S. at 43.  Though EPA could and should have provided greater analysis here, the agency satisfied its minimal obligations under the Clean Water Act and APA.  Accordingly, the Court finds that EPA meaningfully considered the impact that the revised water quality standards could have on aquatic life and wild rice and will not overturn EPA's approval of the revised standards on that basis.

### C.    Consideration of the Bands' Treaty-Reserved Rights

The Bands assert that EPA failed to meaningfully consider the impact that the revised water quality standards would have on Tribal reserved rights, including rights

---

[8] In some ways, the Bands' challenge seems to really be about whether the State can effectively enforce its water quality standards and whether the aquatic life and wild rice standards adequately protect those designated uses.  But this is a separate argument that the Court will address below.

related to wild rice, drinking water, medicinal and Tribally important plants, and aquatic

life. While the Court is disappointed EPA did not do more to meaningfully interact with

the Bands and other Tribes regarding the revised standards, the Court cannot overturn

the agency's approval on that basis.

States and EPA must consider Tribal treaty rights to aquatic and aquatic-dependent

resources to comply with the Clean Water Act and implementing regulations. *See* 33

U.S.C. §§ 1313(c)(2)–(3), 1371(a); 40 C.F.R. §§ 131.5, 131.6, 131.10(b). Failure to do so

may be grounds for overturning the agency's approval of water quality standards. *See,*

*e.g.*, *Miccosukee Tribe of Indians of Fla. v. United States*, No. 04-21448, 2008 WL 2967654,

at *38 n.70 (S.D. Fla. July 29, 2008) (finding that EPA violated Clean Water Act in part by

failing to consider the effects of the revised water quality standards on the Miccosukee

Tribe's downstream water uses).

In reviewing Minnesota's revised standards, EPA invited Tribal representatives to

consult on the revisions. After two conference calls and reviewing Tribal comments, EPA

sent the Tribes a letter that summarized the issues identified by the Tribes and discussed

how EPA considered those concerns in its review.[9] EPA explained that many of the Tribes'

concerns relate to Class 3 and 4 designated uses and criteria revised in the 2021

---

[9] MPCA also acknowledged the Bands' concerns about the revisions' potential impact on aquatic life and wild rice and actively engaged with the Bands throughout the revision process. AR 819, 983–94. MPCA addressed the Tribes' concerns in their response to the Tribes' comments, in meetings with the Tribes, and in MPCA's technical documents. AR 983–90, 1033–40, 1062–1120, 1136–55.

rulemaking, while others were outside the scope of its evaluation of the revised standards.  AR 8821.  Given the overlap between concerns about the standards' impact on aquatic life and wild rice and the Tribes' treaty-reserved rights, EPA explained that its evaluation of the standards' impact on aquatic life and wild rice also applied to the Tribes' comments related to their Tribal reserved rights.  AR 3925 at n.21.

As the Court found above, EPA's conclusion that the Bands' rights will remain protected by separate, unaffected water quality standards is not unreasonable.  The revisions to the water quality standards involve the evaluation of technical science and data, an area of agency expertise.  The Court therefore is not in a position to question the agency's rational decision to approve the revised Class 3 and 4 standards based on the conclusion that other, unaffected, EPA-approved water quality standards will protect other designated uses.  As a result, the Court finds that EPA sufficiently considered the revised water quality standards' impact on the Bands' treaty-reserved rights.

To be sure, the EPA could and should have more meaningfully interacted with the Bands.  The Bands are sovereign, federally recognized entities.  And they are authorized to administer water quality standards in the same way that states do. 33 U.S.C. § 1377(e).  It is disappointing that EPA's idea of meaningful consultation with the Tribes consists of two virtual meetings and one set of written comments.  Yet the law does not clearly require more, even if that would be the Court's preference.  And as above, the Court's

review of EPA's action is very deferential. *State Farm*, 463 U.S. at 43. Accordingly, EPA's approval was not arbitrary or capricious.

### D.   Minnesota's Implementation of Its Water Quality Standards

The Bands claim that EPA acted arbitrarily by failing to meaningfully consider Minnesota's implementation and enforcement of its existing water quality program. *See Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017) ("[The] standard obligates the agency to examine all relevant factors and record evidence, and to articulate a reasoned explanation for its decision."). Primarily, the Bands contend that EPA based its approval on an unrealistic assumption that Minnesota's implementation of narrative criteria would result in more stringent limitations in NPDES permitting and other regulatory decisions.[10] Yet, the Bands assert, the stark reality is that the State has struggled for years to implement and enforce its water quality standards, a fact which MPCA itself admits. AR 984 ("MPCA recognizes that many older narrative standards are not regularly enforced, in that they are not generally incorporated into permit limits.");

---

[10] The Bands also attack the adequacy of the narrative translators for industrial consumption and irrigated agriculture uses, primarily because they now evaluate compliance with water quality standards at the point an industrial or agriculture user withdraws water rather than at the point of pollution discharge. Under this method, the Bands assert there is no way to assess the overall health of the water as it relates to aquatic life and wild rice. However, the narrative translators are in place to protect industrial consumption and irrigated agriculture uses, not aquatic life and wild rice. Industrial and agricultural uses occur at the point the industrial or agricultural user withdraws water, so the overall health of the water between a discharge point and a withdrawal point is not relevant to protecting industrial or agricultural users because they do not make instream uses of the waters.

*see also* AR 7828 (reporting sulfate discharges from Keetac mine that exceed the 10 mg/L sulfate limit in the permit).

The Court sympathizes with the Bands' concerns about Minnesota's implementation and enforcement of narrative standards.  Indeed, the lack of numeric criteria and difficulties in deriving effluent limits for permits to enforce narrative criteria are deeply alarming, especially when considering the threat that over-polluting has on Minnesota waters.  However, EPA determined that despite the State's implementation struggles, Minnesota's implementation plans to ensure that its existing narrative and biological criteria for aquatic life and wild rice would appropriately protect their designated uses were sufficient.  In fact, the plan to protect aquatic life was developed using a method described in EPA's own benchmark study, which was extensively peer-reviewed.  The Court cannot overturn EPA's conclusion that current science does not define appropriate numeric limits for the salt pollutants and thus provides no alternative to narrative standards.

More importantly, whether Minnesota has been struggling to implement and enforce its water quality standards is not an explicit factor that EPA must consider in deciding whether to approve a state's water quality standards.  *See* 40 C.F.R. § 131.5(a). The agency is charged with determining whether the water quality standards meet the regulatory requirements to, among other things, adequately protect their designated uses, not how the State may implement and enforce them.  While feasibility of

-33-

implementing narrative standards perhaps should be considered in the approval process, the regulations do not require such consideration. Moreover, whether the State will struggle to implement the revised water quality standards is premature. Therefore, the Court finds that Minnesota's implementation and enforcement of its previous water quality standards does not make EPA's approval of the revised standards arbitrary or capricious.

**CONCLUSION**

Though the Court is in substantial agreement with the Bands' concerns regarding the revisions' potential to impact aquatic life, wild rice, and their treaty-reserved rights to use Minnesota waters, the revised water quality standards involve the evaluation of technical science and data, of which EPA and MPCA are experts. On the record before the Court, EPA's decision is rational, and the Court's hands are severely tied under the APA's deferential standard of review.

Because the agency determined that current science does not support the retention or establishment of numeric criteria to protect industrial consumption or irrigated agriculture uses, EPA's approval of the State's removal of the numeric criteria was not arbitrary or capricious. And because EPA concluded that aquatic life and wild rice, as well as the Bands' treaty-reserved rights, would continue to be protected by separate, unaffected water quality standards tailored to those ends, neither was EPA's decision arbitrary or capricious on those bases. Finally, whether Minnesota has been struggling to implement and enforce its water quality standards is not an explicit factor

-34-

that EPA must consider in deciding whether to approve a state's water quality standard, and thus not a basis upon which the Court can overturn the agency's decision.  As a result, it was not arbitrary or capricious for EPA to approve Minn. R. 7050.0223 and Minn. R. 7050.0224.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiffs' Motion for Summary Judgment [Docket No. 88] is **DENIED**;

2. Defendants' Motion for Summary Judgment [Docket No. 99] is **GRANTED**;

3. Intervenor-Defendants Coalition of Greater Minnesota Cities, Range Association of Municipalities and Schools, Minnesota Chamber of Commerce, Cleveland-Cliffs, Inc., and United States Steel Corporation's Motion for Summary Judgment [Docket No. 103] is **GRANTED**; and

4. Intervenor Defendant Minnesota Pollution Control Agency's Motion for Summary Judgment [Docket No. 107] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  March 29, 2024
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
United States District Judge